General Counsel
Jonathan E. Nuechterlein

Svetlana S. Gans, DC 478651
P. Connell McNulty, PA 87966
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop: H286
Washington, D.C. 20580
Tel. (202) 326-3708 (Gans)
Tel. (202) 326-2061 (McNulty)
Fax (202) 326-3395
sgans@ftc.gov; pmcnulty@ftc.gov

JARED C. BENNETT, Assistant United States Attorney (#9097)
185 South State Street, #300
Salt Lake City, Utah 84111
Telephone: (801) 524-5682

Attorneys for Plaintiff
Federal Trade Commission

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>     Plaintiff,<br>     v.<br><br>APPLY KNOWLEDGE, LLC, also doing business as APPLY KNOWLEDGE INSTITUTE and COACHING DEPARTMENT, a Utah limited liability company;<br><br>DAHM INTERNATIONAL, LLC, a Utah limited liability company;<br><br>DOMINION OF VIRGO INVESTMENTS, INC., a Utah corporation;<br><br>ECOMMERCE SUPPORT, LLC, an Idaho limited liability company;<br><br>ESSENT MEDIA, LLC, a Utah limited liability company; | Case No. _____<br><br>**Plaintiff Federal Trade Commission's Motion for *Ex Parte Emergency* Temporary Restraining Order, Other Equitable Relief, and Supporting Memorandum of Law**<br><br><br>[Filed Under Seal] |

EVERTEX SOLUTIONS, LLC, a Utah limited
liability company;

EVI, LLC, also doing business as MEMBERS
LEARNING CENTER, a Utah limited liability
company;

NEMROW CONSULTING, LLC, a Utah limited
liability company;

NOVUS NORTH, LLC, also doing business as
MYMENTORING, YES INTERNATIONAL,
LLC, and YOUR ECOMMERCE SUPPORT
INTERNATIONAL, LLC, a Utah limited liability
company;

PURPLE BUFFALO, LLC, a Utah limited
liability company, also doing business as
Netmarketing;

SUPPLIER SOURCE, LLC, a Utah limited
liability company;

365DAILYFIT, LLC, a Utah limited liability
company, also doing business as Net Training;

VENSURE INTERNATIONAL, LLC, a Utah
limited liability company;

VI EDUCATION, LLC, a Nevada limited
liability company;

DAVID GREGORY BEVAN, individually and as
an officer, director, or owner of eCommerce
Support, LLC;

JESSICA BJARNSON, individually and as an
officer, director, or owner of NOVUS NORTH,
LLC;

PHILLIP EDWARD GANNUSCIA, individually
and as an officer, director, or owner of Dominion
of Virgo Investments, Inc., Essent Media, LLC,

Novus North, LLC, and Vensure International, LLC, and as a *de facto* principal of eCommerce Support, LLC, EVI, LLC, VI Education, LLC, and 365DailyFit, LLC;

CHAD HUNTSMAN, individually, and as an officer, director, or owner of VI Education, LLC;

RICHARD NEMROW, individually and as an officer, director, or owner of Nemrow Consulting, Essent Media LLC, Novus North, LLC, and Vensure International, LLC;

JEFFREY NICOL, individually and as an officer, director, or owner of 365DailyFit, LLC and Dahm International, LLC;

THOMAS J. RISKAS, III, individually and as an officer, director, or owner of EVI, LLC and Purple Buffalo, LLC;

BABATA SONNENBERG, individually and as an officer, director, or owner of eVertex Solutions, LLC and Supplier Source, LLC; and

KEN SONNENBERG, individually and as an officer, director, or owner of Apply Knowledge, LLC and eVertex Solutions, LLC,

Defendants.

3

Table of Contents

I.    GROUNDS FOR MOTION AND RELIEF SOUGHT...................................10

II.   STATEMENT OF FACTS..........................................................................12

      A. DEFENDANTS' BUSINESS PRACTICES............................................12

            1.  Phase One: In the Work-At-Home Kit/Lead Generation Phase,
                Defendants Lure Consumers with Emails and Websites Designed to Make
                Consumers Believe They Can Earn a Substantial Income Via Defendants'
                Work-At-Home Kits.....................................................................12

            2.  Phase Two: Defendants Trick Consumers Into Buying Costly Coaching
                Services With Claims That Consumers Will End Up With a Successful
                Business Generating Thousands of Dollars a Month.........................23

                  a)  Defendants Misrepresent Their Role and the Reason for Their
                      Call...............................................................................24

                  b)  Defendants Misrepresent How Much Money Consumers Can
                      Expect to Earn..................................................................27

                        (i)  Defendants, Through a Variety of Explicit and Implicit
                             Earnings Claims, Convince Consumers That They Will
                             Earn Thousands of Dollars a Month Via the Business
                             Coaching Program...................................................27

                        (ii) Consumers Do Not Earn A Substantial Income After
                             Participating in the Business Coaching Program...........32

                  c)  Defendants Misrepresent the Goods and Services That the
                      Business Coaching Program Will Provide...............................34

            3.  Phase 3: In the Coaching Fulfillment/Add-On Services Phase, Defendants
                Misrepresent That Add-On Services are Part of or Integral to the
                Business Coaching Program and That Consumers Need Them to
                Succeed....................................................................................39

            4.  Defendants Have Continued Their Deceptive Conduct in the Face of Law
                Enforcement Scrutiny By Creating New Entities and Merchant Accounts
                To Avoid Detection......................................................................42

4

        a) Defendants Have Created New Entities in the Face of Law
           Enforcement Scrutiny.................................................................42

        b) Defendants' Deception is Evidenced High Chargeback Rates and
           Multiple Merchant Accounts...........................................44

  B. THE DEFENDANTS.......................................................................47

      1. Corporate Defendants...........................................................47

      2. Individual Defendants...........................................................53

III.  LEGAL ARGUMENT...........................................................................59

  A. SECTION 13(b) OF THE FTC ACT AUTHORIZES THIS COURT TO
    GRANT THE REQUESTED RELIEF...............................................60

  B. THE FTC HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS
    AND THE EQUITIES WEIGH IN FAVOR OF THE REQUESTED
    RELIEF.......................................................................................61

      1. The FTC Has Demonstrated a Likelihood of Success in Establishing That
         Defendants Have Violated Section 5 of the FTC Act...........................61

        a) Defendants Misrepresent That Consumers Will Earn Thousands
           of Dollars per Month by Using Their Work-At-Home Kits, the
           Business Coaching Program, and the Add-On Services............63

        b) Defendants Misrepresent What Products and Services Consumers
           Will Receive and How Much They Will Have to Pay................66

      2. The FTC Has Demonstrated a Likelihood of Success in Establishing That
         Defendants Have Violated the TSR...............................................68

        a) Defendants Have Misrepresented Material Aspects of an
           Investment Opportunity in Connection with Telemarketing......70

        b) Defendants Have Misrepresented the Performance, Efficacy,
           Nature, or Essential Characteristics of Goods and Services........70

      3. The Equities Weigh in Favor of Granting Injunctive Relief................72

  C. DEFENDANTS ARE A COMMON ENTERPRISE AND JOINTLY AND
    SEVERALLY LIABLE FOR THE LAW VIOLATIONS............................73

D.  INDIVIDUAL DEFENDANTS ARE LIABLE FOR INJUNCTIVE AND MONETARY RELIEF...........................................................................78

E.  AN EX PARTE TRO WITH ADDITIONAL EQUITABLE RELIEF IS NECESSARY TO PRESERVE EFFECTIVE FINAL RELIEF.....................80

    1.  The Proposed TRO Should Be Entered Ex Parte................................81

    2.  An Asset Freeze and a Temporary Receiver are Necessary.................82

    3.  Expedited Discover and Immediate Access to Defendants' Business Premises are Essential...........................................................................86

VI. <u>CONCLUSION</u>.........................................................................................86

**Table of Authorities**

**Cases**

*AT&T Broadband v. Tech Comm'n., Inc.*, 381 F.3d 1309 (11th Cir. 2004) ................................... 82

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999) ................................. 60, 61, 78, 79

*FTC v. Am. Nat'l Cellular, Inc.,* 810 F.2d 1511 (9th Cir. 1987) .................................................. 60

*FTC v. Amy Travel Serv., Inc.*, 875 F. 2d 564 (7th Cir. 1989) .......................................... 63, 78, 79

*FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012) ..................................... 80

*FTC v. Cyberspace.com, LLC,* 453 F.3d 1196 (9th Cir. 2006) ......................................... 62, 63, 68

*FTC v. Direct Benefits Group, LLC*, No. 6:11-cv-1186, 2013 U.S. Dist. LEXIS 100593, *53

   (M.D. Fla. July 18, 2013) ................................................................................................. 73, 74, 76

*FTC v. Febre,* No. 94 C 3625, 1996 U.S. Dist. LEXIS 9487, *8 (N.D. Ill. July 3, 1996) ............ 64

*FTC v. Figgie Int'l*, 994 F.2d 595, 605 (9th Cir. 1993) ................................................................. 63

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000) ...................................... 79

*FTC v. Freecom Commc'ns, Inc.,* 401 F.3d 1192 (10th Cir. 2005) ...................................... passim

*FTC v. Grant Connect*, 827 F. Supp. 2d 1199 (D. Nev. 2011) ........................................ 46, 74, 77

*FTC v. Grant Connect, LLC*, 2:09-CV-01349-PMP-RJJ, 2009 U.S. Dist. LEXIS 94201, *24 (D.

   Nev. Sep. 22, 2009) .................................................................................................................... 62

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) .............................................................. 60

*FTC v. Home Assure*, No. 8:09-cv-547-T-23TBM, 2009 U.S. Dist. LEXIS 32053, *14, n.8 (M.D.

   Fla. Apr. 8, 2009) ....................................................................................................................... 62

*FTC v. Ivy Capital, Inc.*, No. 11cv283 (D. Nev.) .......................................................................... 60

*FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052 (C.D. Cal. 2012) .......... 68, 79, 80

*FTC v. Johnson*, No. 10cv2203 (D. Nev) ....................................................................................... 60

*FTC v. Kuykendall*, 371 F.3d 745 (10th Cir. 2009) ...................................................................... 63

*FTC v. Kuykendall*, No. 96-cv-00388 (W.D. Okla.) ..................................................................... 81

*FTC v. Loanpointe, LLC*, No. 2:10-CV-225DAK, 2011 U.S. Dist. LEXIS 104982, *10 (D. Utah

   Sep. 16, 2011) .............................................................................................................. 62, 73, 74

*FTC v. Mallett*, 818 F. Supp. 2d 142 (D.D.C. 2011) .................................................................... 62

*FTC v. Network Services Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010)...................................... 74, 77

*FTC v. Pantron I Corp.,* 33 F.3d 1088 (9th Cir. 1994).................................................................. 62

*FTC v. Skybiz.com, Inc.*, No. 01-CV-396, 2001 U.S. Dist. LEXIS 26314, *15-16 (N.D. Okla.
    Aug. 2, 2001) .............................................................................................................. 75, 77

*FTC v. Skybiz.com, Inc.*, No. 01cv396K(E), 2001 U.S. Dist. LEXIS 26175, *40-41 (N.D. Okla.
    Aug 31, 2001) *aff'd*, 57 Fed. Appx. 374 (10th Cir. 2003) ................................................ passim

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009)........................................................................... 69

*FTC v. Sterling Drug, Inc.*, 317 F.2d 669 (2d Cir. 1963) ............................................................... 63

*FTC v. U.S. Hotline, Inc.* No. 93-cv-00444 (D. Utah)................................................................... 81

*FTC v. Wolf,* No. 94-8119-CIV, 1996 U.S. Dist. LEXIS 1760, *23 (S.D. Fla. Jan. 1996) .... 74, 76

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1021 (7th Cir. 1988)............................. 63

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) ............................................ 61, 72

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996) ....................................................... 78, 79

*In re Vuitton et Fils*, 606 F.2d 1 (2d Cir. 1979) ............................................................................ 81

*In the Matter of Thompson Med. Co. Inc.,* 104 F.T.C. 648 (1984*)*................................................ 62

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009)................................................................... 82

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992)......................................................................... 64

*McGregor v. Chierico*, 206 F.3d 1378 (11th Cir. 2000)................................................................ 63

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946)...................................................................... 61

*SEC v. First Fin. Group*, 645 F.2d 429 (5th Cir. 1981)................................................................. 84

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972)................................................. 82

*SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125 (9th Cir. 1991) ............................................... 74, 77

*Standard Educators, Inc. v. FTC*, 475 F.2d 401 (D.C. Cir. 1973), *cert. denied*, 414 U.S. 828
    (1973) ............................................................................................................................... 79

*Thiret v. FTC*, 512 F.3d 176 (10th Cir. 1975)............................................................................... 25

*Thompson Medical Co., Inc. v. FTC*, 791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086
    (1987) ........................................................................................................................... 62, 63

*U.S. v. ACB Sales & Service, Inc.*, 590 F. Supp. 561 (D. Ariz. 1984)........................................... 74

*U.S. v. Dish Network, LLC*, 667 F. Supp. 2d 952 (N.D. Ill. 2009) ............................................... 69

*United States v. Diapulse Corp. of America*, 457 F.2d 25 (2d Cir. 1972) ..................................... 72

*United States v. Tri-State Home Improv. Co.*, 1977 U.S. Dist. LEXIS 14741,*4-5 (E.D. Wis. 1978) ............................................................................................................................... 25

**Statutes**

15 U.S.C. § 45(a) ............................................................................................. 9, 58, 60, 61, 68

15 U.S.C. § 53(b) .................................................................................................................. 59, 60

**Rules**

16 C.F.R. Part 310 ........................................................................................... 9, 60, 68, 69

Fed. R. Civ. P. 1 ......................................................................................................................... 85

Fed R. Civ. P. 26 ....................................................................................................................... 85

Fed R. Civ. P. 34 ...................................................................................................................... 85

Fed. R. Civ. P. 65 .............................................................................................................. 11, 80

## I.   GROUNDS FOR MOTION AND RELIEF SOUGHT

Plaintiff, Federal Trade Commission ("FTC"), moves this Court for an ex parte emergency temporary restraining order to immediately halt an insidious Internet and telemarketing scheme that violates Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a) ("FTC Act"), and the Telemarketing Sales Rule, 16 C.F.R. Part 310 ("TSR") and has bilked consumers out of tens of millions of dollars.[1]  The Defendants responsible for the scheme operate as a common enterprise to prey on consumers hoping to earn money via a home-based Internet business.  Using a multitude of corporate names and oft-changing d/b/as, Defendants rely on deceptive tactics to induce consumers to pay thousands of dollars—most of it borrowed on their credit cards—for goods and services that are of little if any value in creating a home-based Internet business. Consumers make these purchases based on Defendants' representations that they will end up with an online business generating substantial revenue.  Yet, most consumers who purchase Defendants' goods and services earn little or no money and end up heavily in debt.

---

[1] In the course of an extensive investigation into Defendants' business practices, the FTC has amassed a wealth of evidence, including over 600 consumer complaints, twenty-two sworn consumer affidavits, thousands of pages of bank statements and related documents covering corporate and merchant accounts, Internet records, two recorded undercover purchases from Defendants, one undercover online purchase from a Utah Department of Commerce, Consumer Protection Division investigator, and voluminous investigative files, including telemarketing scripts.  The FTC submits 17 volumes of exhibits in support of its motion, including sworn declarations from 22 consumer victims of the Defendants' scheme, two FTC investigators, one FTC paralegal, one FTC financial forensics specialist, one investigator with the Utah Department of Commerce's Consumer Protection Division, Defendants' former payment processor, and two Better Business Bureaus.  Exhibits are marked beginning with Plaintiff's Exhibit 1 and cited with the abbreviation "PX" followed by the exhibit number. Exhibits that are declarations also include a citation to the numbered paragraph where the relevant testimony occurs. Transcripts of oral communications are cited by page and line number(s).

Defendants' scheme consists of three interconnected phases, with different Defendants performing different functions.  Each Defendant's role is integral to the overall success of the scheme.  In the first phase, Defendants use emails and websites to induce consumers to purchase relatively inexpensive work-at-home kits.  In the second phase, Defendants use telemarketing to sell consumers a much more expensive program of business coaching services and related goods that Defendants say will provide consumers with a profitable online business.  In the third phase, Defendants purport to provide consumers with the promised "coaching" services, while they or related telemarketers direct and urge consumers to purchase costly add-on business services, known as "upsells," such as business formation, website design, website development, accounting and tax filing services, and drop-shipping services.  Consumers however rarely, if ever, end up with a profitable online business, and Defendants' scheme continues until consumers either realize that they are victims of a scam or until they reach the limits on their credit cards.

In order to put an immediate stop to this scheme, that has caused millions in consumer injury, the FTC seeks the entry of an *ex parte* temporary restraining order ("TRO") under Fed. R. Civ. P. 65(b).  The proposed TRO would enjoin Defendants' unlawful practices, freeze their assets, appoint a temporary receiver, give the FTC and the receiver immediate access to business premises and records, and authorize expedited discovery.  A TRO is necessary to stop ongoing harm to the public and to prevent dissipation of assets and destruction of records, thereby preserving the Court's ability to provide effective final relief to the victims of Defendants' unlawful scheme.

11

## II.    STATEMENT OF FACTS

### A.    DEFENDANTS' BUSINESS PRACTICES

Since at least 2009, and continuing thereafter, Defendants have engaged in a coordinated scheme designed to sell various work-at-home programs, business coaching programs, and related services and goods.  Defendants have marketed their programs and related goods and services via email, Internet sites, and by use of one or more telephones involving more than one interstate call.  The Defendants' scheme has three interconnected phases: (1) the Work-At-Home Kit/Lead Generation phase; (2) the Business Coaching Program/Telemarketing phase; and (3) the Coaching Fulfillment/Add-On Services phase.  Each phase is an integral and interconnected part of Defendants' scheme, the purpose of which is to deceive consumers and take as much of their money as possible.  In all three phases of Defendants' scheme, Defendants use a variety of misleading and deceptive tactics that violate the Federal Trade Commission Act, the Telemarketing Sales Rule, or both.

> **1.    Phase One: In the Work-At-Home Kit/Lead Generation Phase, Defendants Lure Consumers with Emails and Websites Designed to Make Consumers Believe They Can Earn a Substantial Income Via Defendants' Work-At-Home Kits.**

In the first phase of Defendants' scheme, the Work-At-Home Kit/Lead Generation phase, Defendants lure consumers to one of their various websites (the "Work-At-Home-Kit Websites") selling relatively inexpensive work-at-home kits (the "Work-At-Home Kits" or "Kits").  In some instances, Defendants attract consumers via spam emails proclaiming that work-at-home positions are available in the consumer's area.[2]  Consumers who click on a hyperlink in the email

---

[2] PX 21 (Yandow dec.) ¶ 2; PX 56 (Palumbo dec.) ¶ 7 (Many consumer complaints the [Utah] Division [of Consumer Protection] has received involve spoofed emails that contain links to the

are delivered to one of Defendants' Work-At-Home-Kit Websites.[3]  In other instances,

consumers find Defendants' Work-At-Home-Kit Websites after searching the Internet for work-

at-home opportunities.[4]

On the Work-At-Home-Kit Websites, Defendants market and sell the Work-At-Home

Kits that claim to show consumers how to make money on the Internet while working from

home.  Defendants' Work-At-Home Kit Websites operate under a variety of names, including

Online Learning Library,[5] Online Profit Masters,[6] Home Profit Academy,[7] Income Masters

Institute,[8] Profit Masters Academy,[9] Profit Web System,[10] and Web Fortune Masters,[11] to list a

few.  Each of these sites sells a relatively inexpensive Kit, typically at prices ranging from $29 to

---

above-described landing pages. The emails appear to be from the recipient's friends or family.
This apparent endorsement by a known person gives the email a veneer of validity.").

[3] PX 21 (Yandow dec.) ¶ 2.

[4]  PX 2 (Athnos dec.) ¶¶ 2-3; PX 3 (Bechen dec.) ¶¶ 2-3; PX 4 (Black dec.) ¶ 3; PX 6
(Cartwright dec.) ¶¶ 2-3; PX 13 (Maryak dec.) ¶ 2; PX 18 (Strapoli dec.) ¶ 2; PX 20 (Wright
dec.) ¶ 2.

[5] PX 94 at Utah-000143.

[6] PX 94 at Utah-000071.

[7] PX 94 at Utah-000067.

[8] PX 94 at Utah-000126.

[9] PX 57 at Utah-000359.

[10] PX 57 at Utah-000384.

[11] PX 57 at Utah-000399.

$99.[12]  Defendants use their Work-At-Home-Kit Websites both to sell their Kits and to collect consumer contact information and thus generate leads for telemarketing Defendants' business coaching programs. [13]

Defendants' Work-At-Home-Kit Websites claim that one or more of the Work-At-Home Kits is guaranteed to earn consumers a substantial amount of money. [14]   The Websites also present false earnings claims and sham testimonials. [15] For example, one of Defendants' Work-At-Home-Kit Websites is profitwebsystem.com, registered to Defendant Essent Media. Upon entering the profitwebsystem.com site, consumers encounter the following screen, which guarantees that a consumer can earn $379 a day working just 60-minues a day from home:[16]

---

[12] *See, infra,* note 32.

[13] PX 56 ¶ 6 ("Many of these leads are obtained through 'landing pages' websites that offer information on work at home business opportunities for small amounts of money, usually less than $100.").

[14] *See e.g.,* http://profitwebsystem.com, PX 66 at Utah-000789; http://webfortunemaster.com, PX 26 at FTC-CD-001811.

[15] *Id.*

[16] *Id.*

Profit Web System                                         http://profitwebsystem.com/profitb97/congratulatic





## Congratulations!

**There is Currently <u>1</u> Position Left In your area.**

**Read The Job Report Below To See If You Qualify**

**Special Report from Sally Brown, the #1 home job consultant in America:**

### If You Can Spare 60 Minutes A Day, We Can Offer You A Certified, Proven And Guaranteed Home Job To Make $379/Day From Home!

"Important: Read my full report now as only 15 people are accepted into this program per city at any given time... because of the personal support given to each new member to ensure everyone's quick financial success. Don't hesitate... this page is taken down (literally) when the limit is reached, so read on...

Consumers also see a screen recounting what the site describes as the "real life rags to riches story" of Sally Brown, a struggling single mother who now earns thousands of dollars a month working just a few hours a day from home by posting "affiliate links" online, and proclaims that Sally Brown is now sharing her knowledge with other consumers via the Profit Web System, as shown on the following screen:[17]

---

[17] PX 66 at Utah-000793.

My name is Sally Brown, and let me tell you, I used to work hard... Really hard... And like millions of other Americans... While hardly getting by, living from pay check to pay check.

I got divorced at a very young age and I was left with having to find a new place to live with my 6 year old daughter. I moved to New Jersey for a fresh start on life which was not easy. I had to work two jobs waitressing and some freelance work on the side just to pay bills.

No matter how hard I worked my bank balance was always at zero at the end of each month, and my credit cards kept accumulating more and more debt. I hated my jobs, my bosses and the debt.

**The Chilling Day That Changed My Life...**

I remember the exact day: It was June 17th, and I got laid off from my full time job, the one that was paying the majority of bills. It was a few days before my little girl's birthday and I was supposed to buy Shannon the birthday presents she had been hoping for. But all of a sudden, I could no longer afford gifts. I didn't even know how I could get enough money together to pay the rent, let alone the food for ...

Sally explains that she is sharing her knowledge via the Profit Web System, and promises that consumers using the system can work from home for an hour and a half a day, five days a week, and earn $97,500 a year.[18]  These representations are false or unsubstantiated.  "Sally Brown" did not go from being a struggling single mother to earning thousands of dollars a month by posting affiliate links through Defendants' program.

Defendants' other Work-At-Home-Kit Websites make similar claims—remarkably similar, in fact.  People who visit Defendants' site Webfortunemaster.com (the Web Fortune Master Website), registered to Defendant Essent Media,[19] for example, encounter a screen with the following familiar rags-to-riches story, except that Sally is now named Jessica, a photograph accompanied her story, and "the chilling day" that changed her life occurred May 19 instead of June 17:[20]

---

[18] *Id*. at Utah-000797.

[19] PX 26, at FTC-CD-001812.

[20] *Id*. at FTC-CD-001816.

**H**ow would you like an easy, proven, and guaranteed way to make extra money from home in your spare time? If you answered yes then this will be the most exciting message that you'll ever read!



And here's why: My name is Jessica Bradley and let me tell you, I used to work hard , really hard and, like millions of other Americans, while hardly getting by, living from pay check to pay check.

I got divorced at a very young age and I was left with having to find a new place to live with my 2 years old daughter.

I moved to Ohio for a fresh start on life which was not easy. I had to work two jobs waitressing and some office work on the side just to pay bills. No matter how hard I worked my bank balance was always at zero at the end of each month, and my credit cards kept accumulating more and more debt. I hated my jobs, my bosses and the debt.

## THE CHILLING DAY THAT CHANGED MY LIFE...

I remember the exact day: It was May 19th, and I got laid off from my full time job, the one that was paying the majority of bills. It was a few days before my little girl's birthday and I was supposed to buy Eleena the birthday presents she had been hoping for.

But all of a sudden, I could no longer afford gifts. I didn't even know how I could get enough money together to pay the rent, let alone the food for us.

The Web Fortune Master Website claims that Jessica Bradley is earning thousands of dollars a month working just a few hours a day from home by posting "affiliate links" online and consumers can do the same, as depicted in the site's projected earnings table, as seen below:[21]

---

[21] PX 26, at FTC-CD-001812.

**HERE'S A SIMPLE ILLUSTRATION OF HOW MUCH MONEY YOU CAN MAKE IN JUST A FEW DIFFERENT SCENARIOS:**

| # Links You Post Per Day | Money You Make Per Day | Money You Make Per Week | Money You Make Per Month | Money You Make Per Year |
|---|---|---|---|---|
| 5 ($15 Each) | $75 | $375 | $1,500 | $19,500 |
| 10 ($15 Each) | $150 | $750 | $3,000 | $39,000 |
| 15 ($15 Each) | $225 | $1,125 | $4,500 | $50,500 |
| 20 ($15 Each) | $300 | $1,500 | $6,000 | $70,000 |
| 25 ($15 Each) | $375 | $1,875 | $7,500 | $497,500 |

Defendants make additional earnings claims via purported consumer testimonials on webfortunemaster.com, such as the following from Josh H.:[22]



"I started in this industry knowing nothing about computers or the Internet. Next thing I knew I was making a solid $4,000 a month"

—Josh H., Provo, UT

These representations are false or unsubstantiated.

Defendants make similar claims on other Work-At-Home-Kit Websites. For example, a North Dakota consumer visited Defendants' ProfitMastersAcademy.com site on August 31, 2012 and read about struggling single mother "Katie Smith."[23]  Ms. Smith's purported photograph

---

[22] *Id.*

[23] PX 6 (Cartwright dec.) ¶ 3, Ex. A at FTC-CD-000139.

accompanied her story, which follows, and it was the same photograph used in Jessica Bradley's

story on webfortunemaster.com:[24]



**H**ow would you like an easy, proven, and guaranteed way to make extra money from home in your spare time? If you answered yes then this will be the most exciting message that you'll ever read!

And here's why: My name is Katie Smith and let me tell you, I used to work hard , really hard and, like millions of other Americans, while hardly getting by, living from pay check to pay check.

I got divorced at a very young age and I was left with having to find a new place to live with my 2 years old daughter.

I moved to North Dakota for a fresh start on life which was not easy. I had to work two jobs waitressing and some office work on the side just to pay bills. No matter how hard I worked my bank balance was always at zero at the end of each month, and my credit cards kept

As with webfortunemaster.com, Defendants' Profit Masters Academy site also contained a

testimonial from Josh H. of Provo, Utah, although this time he had metamorphosed into "Will

C." of Addison, Illinois.[25]

  The remarkable transformations of Jessica and Josh on webfortunemaster.com into Katie

and Will on ProfitMastersAcademy.com are perhaps less remarkable in light of the fact that

Jessica/Katie is actually a photo titled "Woman Posing with Baby Girl" from a stock photo

agency, as seen below:[26]

---

[24] *Id.*

[25] *Id.,* Ex A, at FTC-CD-00143.

[26] PX 40 (http://www.inmagine.com/un%20x%20188/u15770019-photo) at FTC-CD-002217.



And Josh H./Will C., is photo #472639 from www.istockphoto.com:[27]



In fact, there are at least seven other websites with nearly identical testimonials as those on webfortunemaster.com and profitmastersacademy.com, just with different names and photographs.[28]  Defendants' Work-At-Home-Kit Websites do not contain disclosures revealing that the published photographs, stories, and earnings claims are fictional.  In addition, Defendants' Work-At-Home-Kit Websites often times contain icons of reputable news sources,

---

[27] PX 40 (http://www.istockphoto.com/stock-photo-472639-smile.php?st=03d94b1) at FTC-CD-2216.

[28] PX 25 (Tyndall dec.) ¶ 31; PX 41.

such as ABC and CNN, suggesting Defendants' offers are affiliated with or approved by these news outlets.[29]

Consumers who purchase one of Defendants' Work-At-Home Kits, such as those pitched on the Profit Web System Website and the Web Fortune Master Website, enter their contact information and credit card numbers, and gain access to one of Defendants' members-only training websites (the "Training Websites"), such as www.membersonlytraining.com.[30]  The Work-At-Home Kits typically cost $29 to $99.[31]  The Training Websites purport to provide videos and tutorials showing consumers how to readily earn hundreds or thousands of dollars a week from home via Internet marketing. [32]  However, consumers who try to use one of Defendants' Training Websites quickly realize that the websites do not explain how to earn substantial money, as touted on the Work-At-Home-Kit Websites, and observe that many of the pages on the websites simply consist of attempts to sell additional goods or services.[33]

The Kits primarily act to funnel consumers into phase two of Defendants' scheme.  In this second phase, Defendants use consumers' contact information, obtained during the Kit sale,

---

[29] PX 66 at UTAH-000789; PX 92 (Hitt dec.) ¶ 4.

[30]  PX 43 (Jones dec.) ¶¶ 4-6.

[31]  PX 11 (Lower dec.) ¶ 2 (charged $29 for Work-At-Home Kit); PX 9 (Didier dec.) ¶¶ 3-4 (charged $37 for Work-At-Home Kit; PX 6 (Cartwright dec.) ¶ 4 (charged $97 for Work-At-Home Kit); PX 17 (Squires dec.) ¶ 2 (charged $99 for Work-At-Home Kit).

[32] PX 3 (Bechen dec.) ¶ 22; PX 13 (Maryak dec.) ¶¶ 2-3.

[33] PX 25 (Tyndall dec.) ¶¶ 23-25 (clicking on Training Website pages and videos leads to additional sales offers); PX 4 (Black dec.) ¶ 3 ("Every webpage offered a different kind of upsell for the service I had just purchased"); PX 6 (Cartwright dec.) ¶ 6.

to develop "leads" for the deceptive telemarketing of their business coaching programs and related goods. [34]

In a complementary manner, consumers attempting to use the Training Website www.membersonlytraining.com encounter the following screen, directing them to call their "startup specialist": [35]



---

[34] PX 56 (Palumbo dec.), ¶ 6.

[35] PX 25 (Tyndall dec.) ¶¶ 23-25; PX 30.

Consumers who call their "startup specialist" are routed to Defendants' telemarketers, who try to

sell them one of Defendants' business coaching programs as part of the next phase of

Defendants' scheme.[36]  Not to be left out, consumers who buy a Work-At-Home Kit but do not

call their "startup specialist" are, instead, called by telemarketers who try to sell them one of

Defendants' business coaching programs in the next phase of Defendants' scheme.[37]

> **2.     Phase Two: Defendants Trick Consumers Into Buying Costly Coaching
> Services With Claims That Consumers Will End Up With a Successful
> Business Generating Thousands of Dollars a Month.**

As mentioned above, after consumers purchase one of Defendants' Work-At-Home Kits,

Defendants have consumers' contact information.  For consumers who do not call their "startup

specialist," Defendants make telemarketing sales calls pitching a separate product—Defendants'

business coaching and related goods (the "Business Coaching Program").[38]  Defendants offer the

Business Coaching Program under a variety of names, including the Coaching Department,

---

[36] PX 52 (FTC-CD-002309:5-6, FTC-CD-002315:11-12, FTC-CD-002316:13-14 ) ("Corporate office, are you calling to speak with a start-up specialist today? … Just one moment, and I'll transfer you over to the specialist that has your file."); PX 32 at FTC-CD-001910:15-16.

[37] PX 17 (Squires dec. ¶ 4) (called by Defendants selling the Business Coaching Program within ten minutes of sending the cancellation email); PX 13 (Maryak dec. ) ¶¶3-4; PX 6 (Cartwright dec.) ¶¶6-9.

[38] PX 56 (Palumbo dec.) ¶ 9 ("After making purchases from the lead generating websites, consumers are either solicited by telephone, or encouraged through various materials and advertisements to contact a telemarketing floor that sells Apply Knowledge products and services.").  These goods and services purportedly include one-on-one business coaching, website building tools, online training videos, market research tools, search engine optimization and other marketing services, and web hosting services.  PX 72 (Bilotti dec.) Att. A, at EVO-POWERPAY-000492.

Apply Knowledge, eCommerce Support, Global Education Inc., and the Internet Coaching Program.[39]

During Business Coaching Program telemarketing sales calls, Defendants make a variety of misrepresentations, and rely on deceptive sales tactics, in order to sell the Business Coaching Program.

> **a)    Defendants Misrepresent Their Role and the Reason for Their Call.**

Defendants do not reveal that the purpose of their telemarketing call is to sell the Business Coaching Program.  Rather, Defendants typically tell consumers that they are with a different division of the company[40] that is responsible for developing "success stories"—stories that Defendants' company can use to promote itself in "seminars and infomercials"—and that the purpose of their call is to find and vet candidates with whom the company can work to develop a promotable "success story."[41]  Defendants' telemarketing sales calls with consumers often last over an hour, and Defendants are very persistent.[42]

---

[39] PX 25 (Tyndall dec.) ¶¶ 28-29; PX 34-35.

[40] PX 21 (Yandow dec.) ¶ 4; PX 20 (Wright dec.) ¶ 5; PX 25 (Tyndall dec.) ¶ 26 (citing to PX 32 at FTC-CD-001912:15-24); PX 72 (Bilotti dec.), Att. A at EVO-POWERPAY-000679 (Vensure International Master Probe Script) ("Ok, well the reason I am calling is ensure that you follow through with your internet marketing system. I am a member of the Success Team."). Defendants have more recently begun to refer to themselves as the "Marketing Team." *See* PX 67 at Utah 000968 (YES International Master Probe Script); PX 68 at Utah 0003466 (Members Learning Center Master Probe Script); PX 69 at Utah 000937 (Net Training Master Script).

[41] PX 72 (Bilotti dec.), Att. A, at EVO-POWERPAY-000679 (Vensure International Master Probe Script) ("We are actually the ones responsible for developing success stories and testimonials that we are going to be using in our upcoming seminars and infomercials to promote the internet marketing system that you purchased.").

[42] PX 2 (Athnos dec.) ¶ 5 (sales call lasted over an hour); PX3 (Bechen dec.) ¶ 15 (sales call lasted from 10:30am -1:30pm); PX 12 (Mack dec.) ¶ 11 (sales call lasted 111 minutes); PX4

Defendants tell consumers that only a few qualified individuals are selected to work

hand-in-hand with company coaches, and that by working with coaches, the selected consumers

will achieve the type of result that can be promoted as a company "success story."[43]  Defendants

represent that they admit only a select few into their program.[44]  During the telemarketing calls,

Defendants proceed to "interview" consumers, purportedly in order to determine if the

---

(Black dec.) ¶ 14 (sales call lasted over four hours); PX5 (Blackwell dec. ) ¶ 7 (sales call lasted
over an hour); PX13 (Maryak dec.) ¶ 6 (one hour sales call); PX15 (McLellan dec.) ¶¶ 4, 10
(aggressive sales call with high pressure sales tactics); PX21 (Yandow dec.) ¶ 6 (several sales
calls before signing up for the Business Coaching Program); PX 32 at FTC-CD-001912:16-17.

[43] PX 67 at Utah-000968 (YES Master Script) ("I am in the process of qualifying people who
would like to work with our mentors over the next six months to get the right tools and
knowledge to really ensure that their education does generate the type of results that would be
worthy of a success story for us."); PX 68 at Utah 0003466 (Members Learning Center Master
Probe Script) (same language); PX 69 at Utah 000937 (Net Training Master Script) (same
language); PX 32 at FTC-CID-001912:16-25; PX 33 at FTC-CID-001974:4-18, FTC-CID-
002017: 9-10; *see also* PX 16 (Ortmeier dec.) ¶ 5 ("He said that the program is highly selective
because they only want success stories").  The "success team" ploy is essentially a variant of the
old "model home" scam used by aluminum siding salesmen for decades. In such a scam, siding
salesmen tell home owners that they will receive a discounted price on aluminum siding if the
company can use their home as a model home to promote their siding business to other
homeowners. The FTC has brought Section 5 cases against siding companies and contractors for
this practice. *See e.g., Thiret* v. *FTC*, 512 F.3d 176, 180 (10th Cir. 1975); *United States* v. *Tri-
State Home Improv. Co.*, 1977 U.S. Dist. LEXIS 14741,*4-*5 (E.D. Wis. 1978).

[44] PX 52 (FTC-CD-002326:12-14) ("at the one-on-one level, we only do work with 2 to 3
percent"), PX 14 (McDonald dec.) ¶ 6 ("he told me they only hire 1-2% of the applicants"); *see
also* PX 18 (Staropoli dec. ¶ 7) ("[Defendants] told me that the Business Coaching Program was
looking for a 'special elite' group of promising candidates for the program"); PX 6 (Cartwright
dec.) ¶ 13 ("available only to a handful of people"); PX 3 (Bechen dec.) ¶ 9 ("He told me that
very few people were approved and that I should feel special"); PX 32 at FTC-CD-001913:12-18
("we have thousands of people that sign up for this kit each week. We can't work with everyone
closely"); PX 7 (Cruz dec.) ¶ 4 ("it was a select program that was only accepting 7 people from
the California area."); PX 16 (Ortmeier dec. ¶ 5) ("[Defendants' telemarketer] told me he was
recruiting for a special program only available for a few people"); PX 4 (Black dec.) ¶ 4; PX 19
(Telle dec.) ¶ 5.

consumers are "qualified" to join the "success team" program.[45]  As part of this interview

process, Defendants say they need to check the consumer's "qualifications," and proceed to ask

consumers about their finances, savings, and credit limits.[46]  Defendants give consumers the

impression that they are not trying to sell them a product or service, but rather are interviewing

them for an exclusive opportunity to work hand-in-hand with company coaches as part of the

"success team" program, and that Defendants' and consumers' interests are aligned because

Defendants succeed only if the consumer becomes a "success story."[47]  As one consumer recalls,

Defendants said they needed her financial information "to ensure that I was not rich already or

had Internet business experience," which would make hers a less promotable success story.[48]

The true purpose of the Defendants' questions about consumers' finances is to determine how

much Defendants can charge consumers for the Business Coaching Program and add-on business

services, known as "upsells," such as business incorporation, website design, website

development, accounting and tax filing services, and drop-shipping services.[49]  It appears that the

---

[45] *See*, *supra*, note 44.

[46] PX 32 at FTC-CD-001913:18-24, FTC-CD-1914:5-11; PX 33 at FTC-CID-002018 (told it was an "interview"); PX 5 (Blackwell dec.) ¶ 5 ("[the telemarketer] told me that his job was simply to screen applicants"); PX 3 (Bechen dec.) ¶ 7 ("[the telemarketer] told me that his job was to screen candidates for this coaching program. He was only looking for 'qualified' applicants, so he needed to interview me."); PX 10 (Jelke dec.) ¶ 4; PX 12 (Mack dec.) ¶¶ 7, 12-13; PX 7 (Cruz dec.) ¶ 5; PX 33 at FTC-CD-001985:1-10, 12-14; PX 32 at FTC-CD-001961:5-11, PX 52 at FTC-CD-002319:2-10, FTC-CD-002331:18-19).

[47] PX 12 (Mack dec.) ¶ 6.

[48] *Id.* ¶ 7.

[49] PX 15 (McLellan dec.) ¶ 7; PX 19 (Telle dec.) ¶ 8.

more available credit a consumer has, the higher the price quoted for the Business Coaching Program.[50]  Consumers often do not learn that Defendants will charge them for Defendants' coaching program until well into the "interview process."  Though Defendants' coaching program costs thousands of dollars,  Defendants highlight that consumers would really be using a bank's money, what Defendants call "other people's money," to "leverage capital" for their businesses.[51]  Defendants use this hyperbole as a way to assure consumers that any out of pocket expenses will be minimal and quickly recouped.  Defendants' express and implied earnings claims further mislead consumers, as discussed below.

<blockquote>

**b)      Defendants Misrepresent How Much Money Consumers Can Expect to Earn.**

**(i)      Defendants, Through a Variety of Explicit and Implicit Earnings Claims, Convince Consumers That They Will Earn Thousands of Dollars a Month Via the Business Coaching Program.**

</blockquote>

Defendants make various representations as to how much consumers can earn via the Business Coaching Program.  Defendants' earning representations, which take many forms,

---

[50] PX 4 (Black dec.) ¶¶ 11-14 (noting $10,000 in available credit and Business Coaching Program price range of $7,500 to $11,300); PX 14 (McDonald dec.) ¶¶ 9-10 (noting $5,000 credit limit and Business Coaching Program price of $2,900); PX 19 (Telle dec.) ¶¶ 8, 14 (noting available credit of $50,000 and Business Coaching program price of $10,995).

[51] PX 4 (Black dec.) ¶ 13 ("He kept reassuring me that I could use "other people's money" to leverage capital and pay off my debt."); PX 3 (Bechen dec.) ¶ 11 ("he talked to me about using "other people's money" to leverage capital"); PX 12 (Mack dec.) ¶ 16 ("Devin explained the concept of "other people's money. . . . You can charge your credit card, but then transfer it to your business credit card, and then your business pays for the expenses.").

leave consumers with the impression that they will earn several thousand dollars a month via the Business Coaching Program.

As detailed below, in numerous instances, Defendants tell consumers that they can expect their new online businesses will generate $2,000-5,000 a month, or more, within three to six months of starting the Business Coaching Program.[52]  Defendants typically encourage consumers to put the entire cost of the Business Coaching Program—generally between $3,000 and $12,000—on their credit card, and assure consumers that the proceeds of their new Internet businesses will enable them to pay off their card balance within a short time, typically three to six months.[53]

Defendants typically state that since consumers' new businesses will generate enough income to quickly pay off their credit card, the Business Coaching Program will not cost consumers any "out-of-pocket" money.[54]  Defendants typically ask consumers about their financial goals and how much they want to earn from an Internet business.[55]  When consumers

---

[52] PX 7 (Cruz dec.) ¶ 8; PX 8 (Davis dec.) ¶ 4; PX 12 (Mack dec.) ¶ 13; PX 13 (Maryak dec.) ¶ 4 ("He asked me about my goals and how much money I wanted to make.  I answered that I made $3,000 from my old job and that this was my goal.  Chad assured me that I could easily make this through their online coaching program."); PX 15 (McLellan dec.) ¶ 4 ("earn $2,000 within 45-90 days"); PX 19 (Telle dec.) ¶ 11 ("you can easily make $5000 a month in two to three months").

[53] PX 12 (Mack dec.) ¶ 16; PX 19 (Telle dec.) ¶ 15.

[54] PX 4 (Black dec.) ¶ 13; PX 3 (Bechen dec.) ¶ 11; PX 12 (Mack dec.) ¶ 16 (Defendants' representative "said he did not want me to pay off my credit card the first month because 'the business would pay it off by the second month,' and they can truthfully say that I invested very little of my own money," thereby making it a better success story.).

[55] *See infra* note 56.

say that they hope to earn a few thousand dollars a month, they are assured by Defendants that

these goals are readily attainable via their participation in the Business Coaching Program.[56]

Defendants tell consumers about other participants who they claim have earned

thousands of dollars a month through the Business Coaching Program.[57]  Defendants tell

consumers that other program participants have paid off debt on their houses, cars, and school

loans within a year of starting the Business Coaching Program.[58]  Defendants urge consumers to

---

[56] *See e.g.,* PX 69 at Utah-000938 (365DailyFit script) ("when developing your education with
the internet marketing system, what kind of income are you looking to make.  In other words,
what is your supplemental/replacement income goal?  Alright, so if your education from the
internet marketing system could help you achieve your income goals . . . I am assuming that
would be something you could get very excited about right?"); PX 17 ¶ 5 ("Terry asked me what
my goals were and how much money I hoped to make.  I told Terry that I was retired and that I
hoped to supplement my retirement income by making about $1,000-$2,000 per month.  He told
me that I could do even better than that, and told me that their coaching program could help me
make thousands of dollars.  He told me that he knew of eighty-year old women who were
making over $10,000 a month."); PX 4 (Black dec.) ¶6 ("Adam asked me to say exactly how
much money I expected to make in three months, in six months, and in a year.  I answered about
$7,000 to $12,000 in three months; $12,000-$20,000 in six months; and over $50,000 in a year.
Adam told me that I could easily make that, if not more."); PX 13 (Maryak dec. ¶ 4) ("He asked
me about my goals and how much money I wanted to make.  I answered that I made $3,000 from
my old job and that this was my goal.  Chad assured me that I could easily make this through
their online coaching program.").

[57] *See, e.g.,* PX 12 (Mack dec.) ¶ 17; PX 14 (McDonald dec.) ¶ 8; PX 17 (Squires dec.) ¶ 5.

[58] PX 32 at FTC-CD-001920: 4-6 ("we've had students pay off substantial debt, houses, cars, you
know, in that period of time [10-12 months].  We've had students who pay for all their college in
that period of time."); PX 32 at FTC-CD-001965:18-19 (program participants often earned "five
figures" a month.); PX 19 (Telle dec.) ¶¶ 11-12 (referring consumers to Business Coaching
Program website examples of, "smiling happy people who said they had earned a lot of money
through the program); *see also* PX 1 (Anderson dec.) ¶ 3 (Defendants directed him to look at the
Business Coaching Program website, which showcased many examples of successful clients.
"Their testimonials described how easy it was to work at home and earn $10,000 to $20,000 per
month."); PX 10 (Jelke dec. ¶ 6) (Defendants sent him written testimonials from other people

view testimonials on Business Coaching Program websites from other people who purportedly participated in the program.[59]  The testimonials depict satisfied consumers who claim they are earning thousands of dollars a month by selling items on the Internet under the guidance of the Business Coaching Program.  For example, the following testimonial, shown on numerous Business Coaching Program websites, states that "in May 2013, Dan did $28,950 in sales and $6,420 profit on eBay alone in one month!":



Back to Case Studies

**DAN FAZIO – EBAY DROP SHIPPING & GOLD POWERSELLER**
*$6,500 Profit in One Month!*

**OVERVIEW**

Dan Fazio began the coaching program in March 2012. At that time, Dan was working 50-60 hours per week as a lab scientist at a local hospital, not to mention being busy as a husband and father of 2 children. Balancing work, family, and finances became nearly impossible, especially because one of those kids was headed to college, and Dan had no way to pay for the tuition. It was at that time that he started to look for some financial help and found it in the form of the internet coaching program.

Now Dan is cutting back hours with his normal job, easily paying for his kid's education, and enjoying all the perks of being his own boss, in fact, in May 2013, Dan did $28,950 in sales and $6,420 in profit on ebay alone in one month!

**THE COACHING PROGRAM**

Defendants state or imply that it is typical for participants to earn thousands of dollars a month through the Business Coaching Program.[60]  Defendants' telemarketers tell consumers that

---

who had purportedly participated in the Business Coaching Program and had been very successful).

[59] *Id.*

[60] PX 7 (Cruz dec.) ¶ 8 (told that if he put in at least 10 hours a week, he would earn at least $2,000 to $3000 a month); PX 10 (Jelke dec.) ¶ 5 (told he would "definitely make" $40,000 a year); PX 52 at FTC-CD-002409:19-20 (told she would make $2000 to $5,000 a month); PX 1 (Anderson dec.) ¶ 4 (told that he "could easily make over $10,000 a month" as long as he worked between two and three hours a day); PX 8 (Davis dec.) ¶ 4 (told he "could expect $3000 to $5000 per month in three months and $10,000 per month after a year");PX 56(Palumbo dec.) ¶ 11

they, themselves, are earning thousands of dollars a month selling items online using the

techniques taught in the Business Coaching Program.[61]   On one call, for example, Defendants'

telemarketer said that he earned $4,368 in the previous month from just one aspect of his online

business.[62]  Defendants have made the following additional misrepresentations:

- "we're going to have you out there in your third and fourth months, you're going

  to be anywhere between a $2- and a $5000 range a month";[63]

- "we like our students to be in the $2- to $5000 range a month in the third and

  fourth month of it";[64]

- "you can get out there and get into a business (inaudible) and make 50 grand";[65]

- "we're not going to get you up to making three, four grand in your first month …

  we set out 90 to 120 days. . .";[66]

---

("Most of the complaints the [Utah] Division [of Consumer Protection] has received against
Apply Knowledge and Novus North have alleged that the salesperson made representations
about the earning potential for the services. For example, many consumers who purchase the
coaching services are told that they will make enough money within a few months to pay off
their large credit card bills."); PX 12 (Mack dec.) ¶ 17 (Defendants also told her about a "guy
they just made into a 'case study'" who, after participating in the program, 'had paid off his
house and retired from his job and is making $7000 to $8000 a month').

[61] PX 32 at FTC-CD-001931:20-22 (telemarketer earned a $4,368 profit selling lawn furniture).

[62] *Id.*

[63] PX 52 at FTC-CD-002409:19-21.

[64] PX 52 at FTC-CD-002380:4-6.

[65] PX 52 at FTC-CD-002340:23-24.

[66] PX 52 at FTC-CD-002328:24-002329:4.

- "this business in four, five months could easily generate the income you're earning now";[67]

- "in three to four months with me, you'd get there [earn what you're making now]. … And then if you wanted real money, you know, then you're out there a year";[68]

- "remember what I'm after is the success story and that is -- does not mean a lemonade stand. . . .We're talking big money. Money that's two, three, four times what you're earning now and then – and then, you know, greater as time flies.";[69]

- "85% of our students graduate. You know what that means? It doesn't mean cap and gown. That means they're making a profit and they've reached certain levels where we actually reward them financially for reaching those levels."[70]

### (ii)   Consumers Do Not Earn A Substantial Income After Participating in the Business Coaching Program.

Defendants' earnings representations regarding the Business Coaching Program are false or unsubstantiated.  Consumers typically do not earn a substantial income through the Business Coaching Program, nor do they recoup their purchase price or end up with a profitable online

---

[67] PX 32 at FTC-CD-001917:5-6.

[68] PX 32 at FTC-CD-001919:15-20.

[69] PX 32 at FTC-CD-001961:5-11.

[70] PX 32 at FTC-CD-001929:1-6.  Further, Defendants' "incentive program," reinforces Defendants' deceptive representations.  It provides: "As soon as you reach over five thousand dollars in gross sales per month for three consecutive months within the first year of enrollment, upon documenting that result, we will refund fifty percent (50%) of your initial investment." PX 12 (Mack dec.), Ex.3 at 2.  However, when pressed about this guarantee, Defendants admitted to

business.[71] Even consumers who put in two and three times the amount of time and effort

suggested by Defendants do not typically earn a substantial income from the "businesses"

developed through the Business Coaching Program.[72] Many consumers have lost thousands, if

---

their credit card payment processor that the goal "was not impossible, but not likely." PX 72
(Bilotti dec.) at Att. A, EVO-POWERPAY-000705-06.

[71] PX 1 (Anderson dec.) ¶ 17 ("I was not able to sell any items through the Coaching Department
services. At no point did anything successful happen. The website that was eventually created
for me was practically useless."); PX 9 (Didier dec.) ¶ 35 ("I never sold anything or earned any
income"); PX 3 (Bechen dec.) ¶ 34 ("After spending nearly one month with the program, the
Coaching Department failed to set up a website for me and I have not earned a single penny
through the program"); PX 4 (Black dec.) ¶ 39 ("I have made two sales in the past year, which
means I've made about $20"); PX 5 (Blackwell dec.) ¶¶ 20 and 24 (did everything coaches asked
for ten months, but website that Coaching Department delivered "was completely useless" and
consumer did not make any money); PX 6 (Cartwright dec.) ¶ 31 (did not make any money or
sales except a test sale to her daughter); PX 7 (Cruz dec.) ¶ 27 ("I was promised a home online
business of my own that would be selling major retail products that would be earning $2000 to
$3000 in 6 to 8 weeks. Instead, I ended up with nothing, and they kept asking for more and more
money to keep participating."); PX 8 (Davis dec.) ¶¶ 7, 8, 25 (utilized all 10 sessions, completed
the program, and spent a great deal of additional time and effort to get their website operational,
but in the end "made no money through my website"); PX 9 (Didier dec. )¶ 32 ("I worked hard at
the Coaching Department program and completed the eight original coaching sessions. By the
end, I did have a rudimentary website for a pet supply business, but the site was not operational
and was not generating any income"); PX 10 ( Jelke dec.) ¶ 27 (never earned any money except
for a few hundred dollars selling items on eBay); PX 11 (Lower dec.) ¶¶ 12, 17 (never had any
sales or made any money); PX 13 (Maryak dec.) ¶ 21 (never sold a single product, never made a
profit); PX 14 (McDonald dec.) ¶ 24 ("I have not made any money through the Coaching
Department's program."); PX 15 (McLellan dec.) ¶ 17 (completed the ten coaching sessions over
three months, but did not end up with a profitable website and made no money); PX 19 (Telle
dec.) ¶ 33 ("I never got any money back from the Coaching Department, and they never helped
me get a profitable website or earn any money online"); PX 20 (Wright dec.) ¶ 13, 16 (have not
made any profit); PX 21 (Yandow dec.) ¶ 27 (earned about $70 total after spending $40,000 on
Coaching Department and related Add-On Services).

[72]  PX 6 (Cartwright dec.) ¶¶ 30-32 and 35 (completed all of her coach's assignments and spent
in excess of five to ten hours a week on the Program, but made no money through the Program
and, instead, lost tens of thousands of dollars); PX 8 (Davis dec.) ¶¶ 7, 8, 25 (utilized all 10
sessions, completed the program, and spent a great deal of additional time and effort to get their
website operational, but in the end "made no money through my website"); PX 16 (Ortmeier

not tens of thousands, of dollars by participating in the Business Coaching Program.[73]  Many of

these consumers are now in debt, are considering bankruptcy, or have had to dip into retirement

savings to pay off swollen credit card balances.[74]

c)  **Defendants Misrepresent the Goods and Services That the Business
Coaching Program Will Provide.**

Defendants tell consumers that by purchasing the Business Coaching Program, including

individual coaching sessions, purportedly valuable video tutorials, and professional website

design services or operational websites,  they will end up with Internet businesses and websites

generating substantial traffic and sales.[75]  Defendants assure consumers that these goods and

---

dec.) ¶¶ 25-28 (spent forty hours a week on her business and wanted it to be successful, but
earned no money related to Business Coaching Program); PX 21 (Yandow dec.) ¶ 27 (completed
all twelve coaching sessions and even built a website herself, but in the end made only about $70
in profit).

[73] PX 2 (Athnos dec.) ¶ 16 ("I made absolutely no money throughout the process and lost over
$18,000.  I made no sales from this program"); PX 8 (Davis dec.) ¶ 7 (did not recoup investment
or earn any money from their new website) and is now in debt for over $20,000); PX 12 (Mack
dec.) ¶ 34 ("I am out approximately $16,000 and I have receiving nothing in exchange for my
money.  I did not get the services that these companies told me that I would get.  I do not have a
profitable —and not even a functioning—website."); PX 13 (Maryak dec.) ¶ 21 (is now in debt
after losing over $14,000); PX 16 (Ortmeier dec.) ¶ 28 (I now have over $15,000 of debt from
this program and nothing to show for it.  We can barely make ends meet. My husband and I are
looking into bankruptcy. In order to keep up with the credit card debt I racked up with the
Coaching Department, I had to stop going to school so that I could take more hours at work.  It
has been a very unpleasant experience for my husband, children and I.").

[74] *Id.*

[75] PX 4 (Black dec.) ¶ 5 (told that Business Coaching Program would build her a working
professional website, provide access to 50,000 drop shippers, and provide research and
accounting software, among other things); PX 5 (Blackwell dec.) ¶ 3 (told the program included
unlimited coaching support, website construction, drop-shippers, research software, and
accounting mentors); PX 16 (Ortmeier dec.) ¶ 6 ("unlimited coaching, custom web design and
development, web meetings, and training tools"); PX 17 (Squires dec.) ¶ 6 (told she would
receive coaching, unlimited phone and email support, web builder tools, EBay research software,

34

services will supply *everything* needed to get up and running with a successful online business,

and promise consumers that their coaches will take them in hand and provide the expertise and

guidance needed to ensure that they succeed.[76]

Some consumers specifically inform Defendants that they have little marketing or

Internet experience, do not know how to run a business, or have a disability, but Defendants

assure them that the Business Coaching Program will take care of everything and make sure that

---

and drop-shipping databases); PX 18 (Staropoli dec.) ¶ 8 (program would include coaching, a
web builder, an accounting package, tax services and access to drop-shippers and coaches would
guide him "every step of the way"); *see also* PX 3 (Bechen dec.) ¶ 15; PX 1 (Anderson dec.) ¶ 3;
PX 12 (Mack dec.) ¶ 18; PX 8 (Davis dec.) ¶ 4; PX 10 (Jelke dec.) ¶ 7; PX 15 (McLellan dec.) ¶
5; PX 19 (Telle dec.) ¶ 14; PX 2 (Athnos dec.) ¶ 4.

[76] PX 2 (Athnos dec.) ¶ 4 ("The representative on the phone promised that the company would
help me create everything I needed to operate a successful business."); PX 6 (Cartwright dec.) ¶
18 (Defendants said her coaches would "do everything to set up a successful business website for
me); PX 7 (Cruz dec.) ¶ 10 (Defendants assured him that the $8,895 for the Business Coaching
Program package was "all that I needed to pay to be successful with the business."); PX 8 (Davis
dec.) ¶ 5 (Defendants "led us to believe that $6,895 was all that we needed to pay be successful
in the online business venture."); PX 10 ( Jelke dec.) ¶ 7 (told the program "would cost $3900
and that would cover almost everything I needed to get set up with a successful online
business."); PX 12 (Mack dec.) ¶ 18 (told that the $8,695 cost for the program was "'totally
inclusive' for me to be successful in the program"); PX 14 (McDonald dec.) ¶ 10 ("[Defendants]
made it seem as though this price would include everything we needed to succeed in the program
and start making money"); PX 16 (Ortmeier dec.) ¶ 6 ("[the Defendants] gave me the impression
that this package would include everything needed to create a success online .... Not once did
[Defendants] that I would need to invest more than the $9895 [Business Coaching Program
purchase price] to create my business."); PX 18 (Staropoli dec.) ¶¶ 8, 11 ("[Defendants] led me
to believe that the initial enrollment charge of $5,495 would cover most or all of the costs of
starting an online business. ... everything I needed to succeed would be included with my $5,495
payment"); PX 19 (Telle dec.) ¶ 14 (Defendants "said the cost for the Coaching Department
program would be $10,995, but he made it seem as though this price would include everything I
needed to succeed in the program and start making money.").

their online businesses and websites get up and running smoothly.[77]   Consumers are therefore

dismayed to later discover that Defendants' coaches do not guide consumers to an online

business, or even provide significant guidance at all.[78]   Defendants' coaching sessions are often

very short,[79] and cover generalities and rudimentary topics.[80]   Other consumers say that instead

---

[77] *See, e.g.,* PX 1 (Anderson dec.) ¶ 5 ("I informed the representative that I was legally blind. The representative assured me that the program would still work"); PX 3 (Bechen dec.) ¶ 10 ("I informed [Defendants' telemarketer] that I was not business savvy and did not know how to run a business.  He assured me that this was not a problem"); PX 6 (Cartwright dec.) ¶ 15 (little computer experience); PX 8 (Davis dec. ) ¶¶ 3-4 (informed Defendants that he and his wife had little experience and needed a "turn-key" operation, and promised they would get that); PX 12 (Mack dec.), Ex. 6 at FTC-CD-000376 ("I am on disability from work due to a severe autoimmune illness.").

[78] PX 16 (Ortmeier dec.) ¶ 24 ("I received very little help"); PX 2 (Athnos dec.) ¶ 11 ("I continued to receive coaching lessons …. However, these lessons were not helpful); PX 5 (Blackwell dec.) ¶¶ 18, 29 ("I never felt like either coach was knowledgeable about selling items online or online business. … The quality of the lessons and coaching sessions was incredibly poor"); PX 9 (Didier dec.) ¶ 27 (the coaching sessions were "quite short, and essentially all that we talked about was my progress selling items on eBay.  We did not talk about seeing up my website or getting my pet supply business going."); PX 2 (Athnos dec.) ¶ 13 ("I thought the coaching programs from the Coaching Department would help me find suppliers for the handbags I wanted to sell. However, neither my coach nor any other representative provided help.  I had to contact the suppliers myself. Every supplier I contacted told me that they only sold handbags to large chain stores, such as Macy's"); PX 10 (Jelke dec.) ¶ 11 ("there was very little instruction, and what there was always had to do with listing items on eBay. … He would say, 'How are you doing on eBay' and we'd discuss my efforts a little bit, and that was it."); PX 13 (Maryak dec.) ¶¶ 11, 21 (her coaching lessons "could not possibly have taught me how to sell anything …. The coaching lessons that I was sold were entirely useless").

[79] PX 10 (Jelke dec.) ¶ 11 ("The coaching sessions lasted about 15-20 minutes, and would have been even shorter had I not kept asking him questions"); PX 14 (McDonald dec.) ¶ 15 ("The call was very brief [15 minutes] and took less time than I had expected"); PX 4 (Black dec.) ¶ 20 ("The lesson was short, lasting no longer than fifteen minutes.").

[80] PX 6 (Cartwright dec.) ¶ 33 (the coach's instruction was "very general in nature and not the 'expert' advice" she was told she would receive); PX 15 (McLellan) ¶ 15 ("Although she was pleasant, I did not learn much from the coaching sessions.  I was taught a lot of generalities."); PX 4 (Black dec.) ¶ 29 ("We spoke about once a week, but these lessons were very basic and unhelpful"); PX 18 (Staropoli dec.) ¶¶ 10 ("my sessions only lasted about 15 minutes").

of guiding them, their coaches simply told them to watch Business Coaching Program webinars

about subjects such as how to use the Internet or open an eBay account.[81]  When consumers ask

questions about how to get their web business going, the coaches often cannot, or will not,

answer, leaving consumers to fumble around on their own.[82]  Many consumers end up with

flawed or non-functional websites, or without a website at all.[83]

---

[81] PX 8 (Davis dec.) ¶¶ 9-10 ("I found out very early in the training that if I didn't have a
question for my coach, the training session would last 5 to 10 minutes with no training, and he
would just tell us to watch webinars about different aspects of the business. … Our coach did not
provide the type of support that was promised to us when we signed up for the program."); PX
16 (Ortmeier dec.) ¶ 24 ("Mike would often just refer me to some videos and websites to get
information"); PX 5 (Blackwell dec.) ¶ 16 (coach "simply told me to watch videos online.  I
watched these videos, but I did not understand most of their content"); PX 14 (McDonald dec.)
¶¶ 15-16 ("Steve told us to watch webinars on the website. … Most of the webinars were 30
seconds long, and I could find all of the information on the Internet in more depth, free of
charge"); PX 4 (Black dec.) ¶ 30 ("The majority of my 'lessons' were e-learning videos and
webinars. Many of the online webinars did not have curriculum or had broken links. The videos I
successfully accessed were over three years old"); PX 3 (Bechen dec.) ¶ 22 ("The trainings
covered various topics such as time management, how to use the internet, how to use eBay, and
how to use a state government website."); PX 13 (Maryak dec.) ¶ 21 ("The training I received
from Rocky [her coach] was practically useless. Watching short one to two minute videos about
selling on eBay is clearly not worth thousands of dollars").

[82] PX 4 (Black dec.) ¶ 30 ("I tried to ask my coach questions during our phone calls, but he
always told me he would get back to me, but never did"); PX 5 (Blackwell dec.) ¶ 16 ("When I
asked [my coach] questions, I received only vague and incomplete answers"); PX 16 (Ortmeier
dec.) ¶ 24 ("I received very little help from Mike. I had many questions for him, but he answered
very few"); PX 21 (Yandow dec.) ¶ 20 (when she asked her coach questions about developing a
website, he usually didn't know the answer. "Instead, he told me, several times, that they had just
changed their web design program and he didn't know how to fully use it yet.  He said he would
get back to me about my questions, but never did").

[83] PX 18 (Staropoli dec.) ¶ 11 ("They did not help me build a website and provided almost
nothing to help me succeed and get a web business going"); PX 1(Anderson dec.) ¶¶ 9-10 (told
website would be created within 4 weeks, instead it took three months and "was full of errors and
did not work correctly"); PX 8 (Davis dec.) ¶ 10 (even after ten weeks of coaching, still had

Though Defendants typically promise that the Business Coaching Program package is

"all-inclusive" or a "one-stop shop," consumers later discover instead that they are expected to

spend thousands of dollars of additional services ("Add-on Services," described *infra* in Section

II (A)(3) detailing the third phase of Defendants' scheme) to get their online business up and

running.[84]

---

"major problems with the website and we have no clue how to correct them"); PX 6 (Cartwright dec.) ¶ 31 (did not receive a fully operational website capable of making sales); PX 21(Yandow dec.) ¶ 27 (had to build a website herself because Business Coaching Program did not build it for her or show her how to do it, and ended up with an unprofessional looking site that does not attract consumer traffic); PX 10 (Jelke dec.) ¶, 27 ("I never got a website, never got set up in an Internet business"); PX 11 (Lower dec.) ¶ 17 (Defendants never set her up with an online business); PX 9 (Didier dec.) ¶ 32 ("By the end, I did have a rudimentary website for a pet supply business, but the site was not operational and was not generating any income."); PX 17 (Squires dec.) ¶ 24 ("My website never worked properly and I was never able to sell a single thing."); PX 2 (Athnos dec.) ¶ 14 ("The coaching program eventually built me a website to sell my items.  However, the websites was absolutely terrible.  Frankly, I was embarrassed to put my name on it and I did not want anyone to see it."); PX 4 (Black dec.) ¶ 32 ("The website was very basic … I do not think the website that the Coaching Department provided to me was of professional quality."); PX 5 (Blackwell dec.) ¶ 20 ("the website was completely useless.  The website did not look professional"); PX 17 (Squires dec.) ¶ 22 ("By May 2013, nine months after I started with the Coaching Department, my website was still not working.  Both my coach and the service that was supposed to help me with website problems were unresponsive. I tried to purchase things on the website myself and the website crashed.").

[84] PX 56 (Palumbo dec.) ¶12 ("Often, soon after consumers purchase coaching services, Supplier Source, LLC, operating out of the same business premises as and closely-affiliated with Apply Knowledge, upsells additional services to the consumers such as drop-shipping services, additional coaching services, and upgraded website or marketing plans.  These upsells occur even though most customers are told that their initial purchase through the telemarketing floor will include everything that is needed in order to be successful."); PX 3 (Bechen dec.) ¶ 22 (shocked to learn she would have to pay for additional services because Defendants had "described the coaching program as all-inclusive"); PX 6 (Cartwright dec.) ¶ 18 ("What I understood from the discussions with the salesmen was that everything I needed to succeed with establishing my own business would be done through the coaching program — meaning, that it would be the final cost, and I would not have to spend additional money outside of the Coaching Department charge."); PX 7 (Cruz dec.) ¶ 29 ("If I knew that it was going to cost me more than $15 to $20 thousand dollars on doing this business [instead of the $8,895 they said would cover everything], I would have just dropped the phone line from the start").  Sheila Ortmeier, for

3.      **Phase 3: In the Coaching Fulfillment/Add-On Services Phase, Defendants Misrepresent That Add-On Services are Part of or Integral to the Business Coaching Program and That Consumers Need Them to Succeed.**

In the third phase of Defendants' scheme, Defendants provide consumers with business coaching products, services and "advice," at the same time that they and third-party telemarketers try to convince consumers to purchase add-on business-related services. Within a week or two of starting the coaching phase—and long before most consumers have any sort of web business up and running—consumers begin receiving calls from telemarketers pitching additional business services, such as business formation, web-design and development, accounting and tax filing services, and drop-shipping services (collectively, "Add-On Services").[85] These Add-On Services are telemarketed by the Defendants, and by third party telemarketers who obtain consumers' names and contact information from the Defendants, either by purchasing or leasing the names, or in exchange for a share of the Add-On Services' sales revenues.[86]

---

instance, recalls that Defendants "gave me the impression that this package would include everything needed to create a success online. . . . Not once did [Defendants] make me aware that I would need to invest more than the $9895 to create my business PX 16 (Ortmeier dec.) ¶ 6.
[85] *See e.g.,* PX 8 (Davis dec.) ¶ 17 (upsells began to occur within days of signing up with the Coaching Department); PX 10 (Jelke dec.) ¶¶ 10, 19 (coach told him that he would be contacted by other companies "that the Coaching Department worked 'in partnership with'…. Each new service that contacted me made it sound as if they had been referred and recommended by the Coaching Department, and that their service was part of the process of getting my website up and running."); PX 21 (Yandow dec.) ¶ 22 (her coach told her she would be getting calls for other "opportunities" and advised her to be receptive to these).

[86] PX72, Att. A at EVO-POWERPAY-000014.

Some of the telemarketing calls for Add-On Services are scheduled by Business

Coaching Program coaches or representatives, and may even occur at times that consumers are

told to expect a call for the purpose of a Business Coaching Program coaching session.  The

coach for consumer, for example, scheduled an appointment for him to "explain the different

types of drop shipping companies."[87]  That appointment turned out to be a sales pitch for Add-

On Services from Defendants' company My Supplier Source, after which he consumer agreed to

pay an additional $6,500 for drop-shipping services that Defendants told him he needed.[88]  When

Defendants call consumers to sell Add-On Services, they invariably claim that without the Add-

On Services, consumers will not be able to make a profit in the Business Coaching Program.[89]

---

[87] PX 8 (Davis dec.) ¶ 16.

[88] *Id.* at ¶ 17 ("Within days of signing up for the Coaching Department program, the Coaching Department started to set up appointments with individuals whom I thought were my coaches. The calls started off like training calls, but at the end of the phone call, these individuals tried to sell us additional services that they tried to convince us that we needed.).

[89] PX 4 (Black dec.) ¶ 25 ("[the defendants] kept insisting that I needed the Supplier Source drop-shipper service. He told me I wasn't taking my online business serious enough); PX 19 (Telle dec.) ¶ 27 (she was told here was no way her new business could make a profit if she did not use their Supplier Source program); PX 7 (Cruz dec.) ¶ 23 ("The salespeople made it seem that all of these additional services were mandatory in order for my business website to succeed."); PX 17 (Squires dec.) ¶ 12 (told that "the only way I could make my business work is if I bought an upgraded package: for $17,000); PX 9 (Didier dec.) ¶ 28 (My Supplier Source Add-On Service seller told her that "in order to have a successful web business, I needed to have drop shippers that would supply my product directly to the customers."); PX 10 (Jelke dec.) ¶ 15 (his coach told him "if I wanted to hit the ground running with my business, it was important that I take advantage of these [Add-On Service] opportunities"); PX 12 (Mack dec.) ¶ 20 (Add-On Service sellers all said she desperately needed their service or that it was part of the program, and Defendant's Supplier Source telemarketer told her that the coaching program would only enable her to earn a profit if she purchased additional $11,700 drop-shipping program); PX 14 (McDonald dec.) ¶ 17 (During the second coaching session, his coach said it was necessary to hire tax professionals and certified public accountants); PX 5 (Blackwell dec.) ¶¶ 10, 15 (telemarketer made Add-On Service seem "'absolutely necessary' for the success of her new business … Every representative marketed their service as essential"); PX 7 (Cruz dec.) ¶ 16

Even when the Add-On Services' sales calls are not specifically arranged by Business Coaching

Program coaches, Defendants' coaches, portraying themselves as consumers' business advisors,

typically direct or urge consumers to purchase the Add-On Services.[90] Defendants and third-

party telemarketers selling the Add-On Services state or imply that they work with the

consumer's Business Coaching Program coach, are calling at the direction of the consumer's

coach, or are themselves part of the Business Coaching Program.[91]

Defendants pitching the Add-On Services to consumers typically state or imply that the

Add-On Services are part of or integral to the Business Coaching Program and that the Services

---

(defendants explained "the absolute necessity" of purchasing an additional drop-shipping package); PX 1 (Anderson dec.) ¶ 11 ("Each service seemed to offer a specific enhancement that promised to make me successful. I was told by the representative something the effect, 'If you don't use this product, then you won't have a successful business.'"); PX 11 (Lower dec.) ¶ 10 ("The salespeople … knew I had signed up with the Coaching Department and told me that their services were necessary in order to succeed"); PX 6 (Cartwright dec.) ¶ 29 (defendants made it seem as though she had to buy the Add-On Service drop shipping program in order to have an online business).

[90] PX 9 (Didier dec.) ¶ 28 (the Add-On Service seller from My Supplier Source "said that he knew I was working with Brandon [of the Coaching Department] and added that it was his job to set me up with drop shippers."); PX 21 (Yandow dec.) ¶ 25 (Add-On Service sellers "always implied that they were my business advisors and were there to instruct me in what I needed to do in order to attain a successful business.").

[91] PX 6 (Cartwright dec.) ¶¶ 26, 29 (some of the Add-On Service sales calls started as coaching advice calls so she "thought they were all part of the Coaching Department program." Defendants' coach also told her she "had to work with Supplier Source in order to find companies that I could buy products from"); PX 7 (Cruz dec.) ¶ 16 (called on date of next coaching appointment by Brandon Smith, who introduced himself as a Business Coaching Program coach).

are essential for consumers' success.[92]   Consumers say they never would have signed up for

Defendants' Business Coaching Program had they known that Defendants' coaches would

provide minimal guidance, that they would have to build their websites essentially on their own,

and that they would be required to shell out thousands of dollars for Add-On Services in order

for their businesses to become fully operational.[93]

> **4.    Defendants Have Continued Their Deceptive Conduct in the Face of Law Enforcement Scrutiny By Creating New Entities and Merchant Accounts To Avoid Detection.**

Rather than ceasing their deceptive conduct in the face of law enforcement and other

scrutiny, Defendants have instead continued their illegal activities using new entities and

multiple merchant accounts to avoid detection.

> **a)    Defendants Have Created New Entities in the Face of Law Enforcement Scrutiny.**

---

[92] PX 4 (Black dec.) ¶ 25 (Defendants "kept insisting that I needed the Supplier Source drop-shipper service. He told me I wasn't taking my online business serious enough."); PX 19 (Telle dec.) ¶ 27 (no way her new business could make a profit if she didn't use their Supplier Source program); PX 7 (Cruz dec.) ¶ 23 (The salespeople made it seem that all of these additional services were mandatory in order for my business website to succeed); PX 5 (Blackwell dec.) ¶ 15 ("I felt like I had no choice but to continue paying for every new service. … I felt like I couldn't back out because all the money I spent would have been a waste. I felt completely trapped."); PX 10 (Jelke dec.) ¶¶ 19-20 ("Each new caller kept saying that it was vital that I use their service if I wanted the business I created through the Coaching Department to be successful. I didn't want the money I had already spent to go to waste, so I kept agreeing to buy the additional services."); PX 13 (Maryak dec.) ¶ 14 (Add-On Service seller "made me feel that if I didn't spend the money for the new product, I would have wasted all the money I had already invested"); PX 19 (Telle dec.) ¶ 26 ("I had already paid $10,995 and I didn't want to have spent all that and still end up with an unprofitable business, so I agreed to pay the $10,300 and join Supplier Source."); PX 4 (Black dec.) ¶ 33 ("I had already invested so much money and I was scared that the entire process was a huge waste.").

[93] *See, e.g.,* PX 2 (Athnos dec.) ¶ 2; PX 3 (Bechen dec.) ¶¶ 23-29; PX 5 (Blackwell dec.) ¶ 29; PX 8 (Davis dec.) ¶ 25; PX 16 (Ortmeier dec. ) ¶¶ 28-29.

Defendants have been the subject of at least three concurrent state investigations and yet continue their deceptive business practices.  In December 2011, the State of Ohio filed a lawsuit against Defendants North Novus, Apply Knowledge and VI Education for, among other things, deceptive telemarketing practices.[94]  The state of Ohio lawsuit is ongoing.  In January 2013, the Utah Division of Consumer Protection ("Utah Division") issued an administrative citation against Novus North, Vensure International, Phillip Gannuscia, Richard Nemrow, Jeffrey Nicol, Skyler Jarman, and Jessica Bjarnson for alleged violations of Utah Consumer Protection laws, including the Utah Telephone Fraud Prevention Act and the Consumer Sales Practices Act, for among other things, deceptive telemarketing practices.[95]  Most of the complaints the Utah Division has received against Apply Knowledge and Novus North have alleged that the salespersons made representations about the earning potential for the services.[96]  Based on these complaints, the Utah Division concluded that "Apply Knowledge and the telemarketing floors work hand-in-hand to knowingly or intentionally defraud consumers through a series of deceptive representations during telephone sales."[97]  The Utah Division settled its action on June 21, 2013.[98]  The Idaho Attorneys General Office filed a complaint against eCommerce Support for deceptive telemarketing practices, and settled the matter in December 2013.[99]

---

[94] PX 76.

[95] PX 56 (Palumbo dec.) ¶ 14.

[96] PX 56 (Palumbo dec.) ¶ 11.

[97] *Id.*

[98] *Id.* ¶ 15.

While these state actions have been pending, Defendants have continued to perpetuate their scam.[100]  For example, Defendants filed a new telemarketing permit application to telemarket under the name Net Training as of June 4, 2013.[101]  The company's telemarketing script is almost identical to the scripts used by Defendants' Vensure International, Novus North and EVI, doing business as Members Learning Center.[102]  Not only does Net Training utilize the same scripts, it also operates from the same business premises, with many of the same employees.[103]  In addition, on June 19, 2013, Individual Defendant Jeff Nicol established yet another new company – Defendant DAHM International – to bill consumers for the Business Coaching Program in deceptive telemarketing transactions.[104]

        **b)**     **Defendants' Deception is Evidenced High Chargeback Rates and Multiple Merchant Accounts.**

Defendants' deception is further evidenced by high credit card chargeback rates and the creation of multiple merchant accounts.  *See generally FTC v. Grant Connect*, 827 F. Supp. 2d 1199, 1222-23 (D. Nev. 2011) (holding that high chargeback rates and creating multiple merchant accounts are indicia of fraud).  Credit card merchant accounts are essential for Defendants to accept credit card payments.  When a consumer disputes a transaction of his or her

---

[99] PX 73.

[100] *See* PX 92 (Hitt dec.).

[101] PX 86; PX 69.

[102] PX 56 (Palumbo dec.) ¶ 10; PX 89 (Hart dec.) ¶ 8.

[103] PX 56 (Palumbo dec.) ¶ 10.

[104] PX 92 (Hitt dec.) ¶ 8.

credit card, a chargeback occurs.[105]  The card associations (*e.g.* Visa and MasterCard) calculate a merchant's chargeback rate as a ratio, which represents the number of chargebacks generated by the merchant in a particular month divided by the number of sales transactions submitted by the merchant in the preceding month.[106]  Credit card associations have established compliance monitoring programs that identify those merchants which generate an excessive number of chargebacks.[107]  Visa's Regulations have in place 1% chargeback thresholds for Visa's monitoring programs, which in part are designed to detect fraud.[108]

In fact, on multiple occasions, Defendants' chargeback rates have exceeded the 1% threshold leading to Defendants' merchant accounts being closed or rejected.[109]  For example, Defendant Vensure's merchant account for "online mentoring service to create your website and how to sell online,"[110] was forced to close six months after it opened due to excessive risk.[111]  Vensure made 1,464 sales (valued over $1.9 million dollars) and incurred 109 chargebacks, a

---

[105] PX 72 (Bilotti dec.) ¶ 5.

[106] *See generally* Visa International Operating Regulations (October 15, 2013), *available at* http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf, at 634 ("Global Merchant Chargeback Program Overview").

[107] *Id.*

[108] *Id.*

[109] PX 72 (Bilott dec. ), Att. B.

[110] PX 72 (Bilotti dec.), Att. A, at EVO-POWERPAY-001298.

[111] PX 72 (Bilotti dec.), Att. B.

rate of over 7 percent.[112]  In addition, Defendant Purple Buffalo's merchant account established in February 2013, during the pendency of state investigations, to sell "business opportunit[ies],"[113] was forced to close eight months later due to excessive risk.  During this 8-month period, Defendant Purple Buffalo made 9,346 sales and incurred 200 chargebacks, a rate of over 2 percent.  Indeed, merchant accounts used or sought by Defendants Apply Knowledge, eCommerce Support, Essent Media, EVI, Purple Buffalo, Vensure, and Supplier Source have either been closed or rejected due to excessive risk.[114]  Defendants eVertex and Apply Knowledge have also been flagged for excessive chargeback rates.[115]

In an effort to perpetuate the fraudulent scheme, evade detection, and circumvent the credit card networks' fraud detection program, Defendants have continued to open new merchant accounts using a slew of shell entities.  *See FTC v. Grant Connect*, 827 F. Supp. 2d 1199, 1222 (D. Nev. 2011) (noting that "Defendants used several different methods to avoid coming under scrutiny, including using many different company names, merchant accounts, and descriptors to avoid having all chargebacks tied to one company, and separating out the charges for the small up front activation fee and then charging higher monthly fees.").  For example, in 2013 alone, Defendants collectively opened hundreds of merchant accounts for shell companies that bill

---

[112] *Id.*

[113] PX 72 (Bilotti dec.), Att. A at EVO-POWERPAY-002203.

[114] PX 72 (Bilotti dec.) ¶ 5.

[115] PX 93.

consumers for Work-At-Home Kits or Business Coaching Program.[116]  Moreover, many of these

merchant accounts and associated billing descriptors appearing on consumer credit card

statements bear little resemblance to the entities who sold consumers the Business Coaching

Program.[117]

      **B.**     **THE DEFENDANTS**

      Defendants work together to achieve a common purpose, deceiving consumers out of

thousands of dollars through the sale of bogus business coaching and work-at-home programs.

The Individual Defendants own and control the Corporate Defendants, and each Defendant plays

a vital role in the common enterprise's operation, as described more fully below.

      **1.**     **Corporate Defendants**

      **Apply Knowledge, LLC**, also doing business as Apply Knowledge Institute and the

Coaching Department, is a closely held, Utah limited liability company.[118]  It operates out of

Provo, Utah.[119]  Defendant Ken Sonnenberg owns Apply Knowledge.[120]  Apply Knowledge is

---

[116] PX 25 (Tyndall dec.) ¶ 22; PX 42; PX 49; PX 72 (Bilotti dec.), Att. B; PX 56 (Palumbo dec.)
¶ 8 (listing other Riskas-member companies).

[117] *See, e.g.*, PX 25 (Tyndall dec.) ¶ 14 (billed by Yeti Point for Defendant EVI's Work-at-Home
Kits); PX 9 (Didier dec.) at FTC-CD-000288 (Ex. B) (transaction with Defendant eCommerce
Support utilizing merchant billing descriptor "KGMENTORING"); PX 7 (Cruz dec.) at FTC-
CD-000220 (Ex. 3) (transaction with Defendant eCommerce Support utilizing merchant billing
descriptor "RockyEComm").

[118] PX 75.

[119] *Id.*

[120] *Id.*

the fulfillment arm of Defendants' common enterprise, supplying coaches for the Business Coaching Program.[121] It also sells Add-On Services to consumers through its subsidiary, Supplier Source, which operates out of the same corporate location as Apply Knowledge.[122] Apply Knowledge also handles consumer complaints and credit card disputes related to Defendants' Business Coaching Program.[123]

**DAHM International, LLC** ("Dahm") is a closely held, single-member Utah limited liability company, incorporated in Salt Lake City, Utah.[124] Dahm is owned by Defendant Jeffrey Nicol.[125] Dahm's merchant account, or accounts, facilitates Defendants' collection of payments from consumers who purchase Defendants' goods or services.[126]

**Dominion of Virgo Investments, Inc.** ("Dominion") is a closely held, Utah corporation. Its principal place of business is in Herriman, Utah.[127] Defendant Phillip Gannuscia is a director of Dominion, which is a parent company (and co-owner of) Defendants Essent Media, Novus North, and Vensure International.[128]

---

[121] PX 56 (Palumbo dec.) ¶ 5.

[122] PX 56 (Palumbo dec.) ¶ 12.

[123] *See e.g.,* PX 22 at UT-BBB-000077.

[124] PX 76.

[125] *Id.*

[126] PX 92 (Hitt dec.) Ex. D.

[127] PX 77.

[128] *Id.*

**eCommerce Support, LLC** ("eCommerce Support") is a closely held, Idaho limited liability company which operated from Eagle, Idaho[129] until December 2013, when eCommerce Support ceased operations in Idaho pursuant to settlement of an action brought against it by the Idaho Attorney General.[130]  Defendants David Gregory Bevan and Phillip Gannuscia own or operate eCommerce Support, which telemarkets the Business Coaching Program.[131]

**Essent Media, LLC** ("Essent Media") is a closely held, two-member Utah limited liability company with its principal place of business in Lehi, Utah.[132]  Essent Media is owned by Defendants Dominion and Nemrow Consulting.[133]  Essent Media operates Work-At-Home-Kit Websites through which it generates consumer names ("leads") for Defendants' Business Coaching Program and Add-On Services.[134]

**eVertex Solutions, LLC** ("eVertex") is a closely held, two-member Utah limited liability company with its principal place of business in Provo, Utah.[135]  eVertex is owned by Defendants

---

[129] PX 78.

[130] PX 73, at Idaho-000016.

[131] PX 73, at Idaho-000051-52.

[132] PX 79.

[133] *Id.*

[134] PX 56 (Palumbo dec.) ¶ 7.

[135] PX 80 (Certified Articles of Incorporation for e-Vertex Solutions, LLC).

Ken and Babata Sonnenberg.[136]  eVertex is part of the fulfillment arm of the scheme, supplying

coaches for the Business Coaching Program.

**EVI, LLC** ("EVI"), doing business as Members Learning Center, is a closely held, Utah

limited liability company that operates from Orem, Utah.[137]  Phillip Gannuscia is an owner of the

company, and Defendant Thomas Riskas is its manager and may hold an ownership interest in

the company.[138]  EVI/Members Learning Center operates Work-At-Home-Kit Websites through

which it generates leads for Defendants' Business Coaching Program and Add-On Services.[139]  It

also telemarkets the Business Coaching Program.[140]

**Nemrow Consulting, LLC** ("Nemrow Consulting") is a closely held, single-member

Utah limited liability company.[141]  Defendant Scott Nemrow owns the company, and its principal

place of business is in Pleasant Grove, Utah.[142]  Nemrow Consulting is an owner of Defendants

Essent Media, Novus North, and Vensure International.[143]

**Novus North, LLC** ("Novus North"), also doing business as MYMENTORING, Your

eCommerce Support International, LLC, and YES International, LLC, is a closely held, two-

---

[136] *Id.*

[137] PX 79.

[138] *Id.*, PX 56 (Palumbo dec.) ¶ 10.

[139] PX 56 (Palumbo dec.) ¶ 10.

[140] PX 68 (Telemarketing Permit Application for EVI dba Members Learning Center).

[141] PX 82.

[142] *Id.*

[143] PX 79; PX 83; PX 87.

member Utah limited liability company with its principal place of business in Lehi, Utah.[144]

Defendant Jessica Bjarnson served as a member of Novus North from September 2009 to

November 2011, and Defendants Dominion and Nemrow Consulting currently own the

company.[145]  Defendants Gannuscia and Nemrow control Novus North through their respective

interests in Dominion and Nemrow Consulting.[146]  Novus North is a principal telemarketer for

the Business Coaching Program.[147]

      **Purple Buffalo, LLC** ("Purple Buffalo"), also doing business as Netmarketing, is a

closely held, two-member Utah limited liability company.[148]  Defendant Thomas Riskas is an

owner of Purple Buffalo, which has its principal place of business in St. George, Utah.[149]  Purple

Buffalo has owned, operated, or otherwise controlled one or more merchant accounts through

which the Defendants have charged consumers for Work-At-Home Kits and the Business

---

[144] PX 83.

[145] *Id.*

[146] *Id.*

[147] PX 56 (Palumbo dec.) ¶ 10.

[148] PX 84.

[149] *Id.*

Coaching Program.[150]  Purple Buffalo's merchant account, or accounts, facilitates Defendants' collection of payments from consumers who purchase Defendants' goods or services.[151]

**Supplier Source, LLC** ("Supplier Source") is a closely held, single-member Utah limited liability company, owned by Babata Sonnenberg.[152]  Its principal place of business is in Provo, Utah.[153]  Supplier Source holds itself out to the public as a division of Apply Knowledge.[154]  Supplier Source is one of the scheme's principal telemarketers for Add-On Services.[155]

**365DailyFit, LLC** ("365DailyFit"), also doing business as Net Training, is a closely held, single-member Utah limited liability company.[156]  Its principal place of business is in American Fork, Utah.[157]  365DailyFit is one of the scheme's principal telemarketers for the Business Coaching Program.[158]

---

[150] PX 49; PX 72 (EVO dec.), Att. B.

[151] PX 72.

[152] PX 85.

[153] *Id.*

[154] PX 72 (EVO dec.), Att. A, at EVO-POWERPAY-000014.

[155] *Id.*

[156] PX 86.

[157] *Id.*

[158] PX 56 (Palumbo dec.) ¶ 10.

**Vensure International, LLC** ("Vensure") is a closely held, Utah limited liability company owned by Defendants Dominion, Nemrow Consulting, and Thomas Riskas.[159]  Its principal place of business is in Lehi, Utah.[160]  Vensure serves or has served as one of the scheme's principal telemarketers for the Business Coaching Program.[161]

**VI Education, LLC** ("VI Education") is a closely-held Nevada limited liability company, with its principal place of business in Lehi, Utah.[162]  It is one of the scheme's principal telemarketers for the Business Coaching Program.[163]  Defendant Chad Huntsman is a manager of the company.[164]  Defendant Gannuscia owns or operates the company.[165]

## 2.    Individual Defendants

Each Individual Defendant owns, operates, or manages one or more of the Corporate Defendants. Each Individual Defendant: (1) has participated directly in the wrongful acts alleged in the Complaint, or had the authority to control them, and (2) each had some knowledge, either actual or constructive, of the wrongful acts.

---

[159] PX 87.

[160] *Id.*

[161] PX 56 (Palumbo dec.) ¶ 10.

[162] PX 88.

[163] *Id.*

[164] *Id.*

[165] PX 56 (Palumbo dec.) ¶ 10.

**David Gregory Bevan** resides in Eagle, Idaho.  He is an owner and the chief executive officer of eCommerce Support, which is one of Apply Knowledge's principal telemarketers.[166] Bevan opened the merchant account for eCommerce Support, which enables it to receive consumer payments.[167]  Bevan is no stranger to law enforcement scrutiny.  He and his prior company, Building Wealth Institute, Inc., entered an Assurance of Voluntary Compliance agreement with the Idaho Attorney General's Office in July 2007, settling allegations of unsubstantiated earnings claims in conjunction with the sale of work-at-home programs similar to those at issue in this matter.[168]  Bevan also signed an Assurance of Voluntary Compliance agreement with the Idaho Attorney General's Office in December 2013, settling claims that eCommerce Support made unsubstantiated earnings claims and other misrepresentations to consumers in connection with Defendants' Business Coaching Program.[169]

**Jessica Bjarnson** resides in South Jordan, Utah.  Bjarnson is married to Gannuscia.  She was a member of Novus North from September 2009 to November 2011, and she is currently the chief financial officer of Novus North,[170] EVI,[171] Vensure International,[172] and VI Education.[173]

---

[166] PX 78; PX 56 (Palumbo dec.) ¶ 10.

[167] PX 72 (Bilotti dec.) ¶ 3.

[168] PX 73.

[169] PX 73.

[170] Ex. 63, at Utah-002855;

[171] *Id*. at Utah-002109.

[172] *Id*. at Utah-002939.

[173] *Id*. at Utah-2126.

Bjarnson is the signatory for several bank accounts used by the common enterprise to collect payments from consumers for both the Work-At-Home Kits and the Business Coaching Program.[174]  Those accounts are in the names of Defendants Dominion, Essent Media, Novus North, and VI Education.[175]  Bjarnson is also the registered agent of Defendants Dominion, eCommerce Support, Essent Media, Novus North, Vensure, and VI Education.[176]  She is a former registered agent for Defendants EVI and 365DailyFit[177]  Bjarnson has disputed chargebacks on behalf of the Common Enterprise.[178]

**Phillip Edward Gannuscia** resides in South Jordan, Utah.  Gannuscia is married to Bjarnson. Gannuscia is a director of Defendant Dominion and through Dominion exercises control over Defendants Essent Media, Novus North, and Vensure.[179]  Before Dominion obtained ownership interests in Essent Media, Novus North, and Vensure, Gannuscia personally held direct or indirect ownership interests in those entities.[180]  Gannuscia is also an owner or has a significant role in operating Defendants eCommerce Support, EVI, VI Education, and

---

[174] PX 71 (George dec.), Att. A.

[175] *Id.*

[176] PX 77; PX 78; PX 79; PX 83; PX 87; PX 88.

[177] PX 81; PX 87.

[178] PX 22 (Utah BBB) at UT-BBB-001307-1309.

[179] PX 79; PX 83; PX 87.

[180] *Id.*

365DailyFit[181] and is a signatory to several bank accounts used by the scheme.[182]  Gannuscia has

submitted telemarketing permit applications for Defendants.[183]  Gannuscia, through Defendant

Essent Media, served as guarantor for Defendant Purple Buffalo.[184]

      **Chad Huntsman** resides in South Jordan, Utah. Huntsman is the sole manager of

Defendant VI Education,[185] which serves as one of the scheme's principal telemarketers for the

Business Coaching Program.[186]  In addition, he is a signatory to several bank accounts used by

the scheme, including accounts used by Vensure and VI Education.[187]  Huntsman has personally

telemarked the Business Coaching Program to consumers.[188]

      **Scott Nemrow** resides in Lehi, Utah.  Nemrow is the sole owner of Defendant Nemrow

Consulting.[189]  Through Nemrow Consulting, Nemrow holds an interest in Defendants Essent

Media, Novus North, and Vensure.[190]  Scott Nemrow is a signatory to several bank accounts

---

[181] PX 56 ¶ 10.

[182] PX 71 (George dec.), Att. B.

[183] PX 67.

[184] PX 72 (Bilotti dec.,) Att. B. at EVO-POWERPAY002202.

[185] PX 88.

[186] PX 56 (Palumbo dec.) ¶ 10; PX 16 (Ortmeier dec. ¶ 9), Ex. B.

[187] PX 71 (George dec.), Att. B.

[188] PX 13 (Maryak dec.) ¶ 4.

[189] PX 82.

[190] PX 79; PX 83; PX 87.

used by the scheme, including Essent, EVI, Novus North, Vensure, and VI Education.[191]  Scott

Nemrow has also opened merchant accounts utilized by the common enterprise, including EVI

and Vensure International.[192]

     **Jeffrey Nicol** resides in Draper, Utah.  Nicol is an owner of Defendant 365DailyFit, and

sole owner of Defendant Dahm, both of which serve as telemarketers for Defendants' Business

Coaching Program.[193]  Nicol manages or has managed a telemarketing sales floor for Novus

North,[194] and is a signatory to several bank accounts utilized by Defendants, including

Vensure.[195]

     **Thomas J. Riskas, III** resides in Orem, Utah. Since 2009, he has been the sole manager

of Defendant EVI and may hold an ownership interest in the company.[196]  In 2012, Riskas signed

and submitted a Telemarketing Permit Application to the Utah Department of Commerce for

EVI to telemarket the Business Coaching Program.[197]  Riskas is also an owner of Defendants

Purple Buffalo[198] and the president of Vensure.[199]  Riskas has opened several merchant and other

---

[191] PX 71 (George dec.), Att. B.

[192] PX 72 (EVO dec.) at Attachment A (EVO-POWERPAY-001428).

[193] PX 76; PX 86; PX 56 (Palumbo dec.) ¶ 10; PX 69.

[194] PX 56 (Palumbo dec.) ¶ 10.

[195] PX 71, Att. B.

[196] PX 81.

[197] PX 68.

[198] PX 84.

bank accounts that have received funds from other Defendants in this case.[200] These accounts facilitate Defendants' collection of payments from injured consumers, who purchase Defendants' goods and services.[201] Riskas manages these accounts to disperse consumer credit card chargebacks and thereby conceal Defendants' practices from credit card issuers and law enforcement.[202]

**Babata Sonnenberg** resides in Orem, Utah. She is married to Defendant Ken Sonnenberg. She is an owner of eVertex, and is the sole owner of Supplier Source.[203] Ms. Sonnenberg is a signatory to bank and merchant accounts utilized by Defendants, eVertex and Supplier Source.[204]

**Ken Sonnenberg** resides in Orem, Utah. He is married to Defendant Babata Sonnenberg. He owns Defendants Apply Knowledge and eVertex.[205] As such, he supplies coaches for Defendants' Business Coaching Program, and oversees telemarketing for Add-On

---

[199] PX 72, Att. A, at EVO-POWERPAY-001590.

[200] PX 72.

[201] For example, Thomas Riskas is a member of YETI Point, LLC, 4Degrees, LLC, and Bull Mountain LLC, among other companies, that sell and have charged consumers for Work-At-Home Hits. PX 25 (Tyndall dec.) ¶ 22; PX 42; PX 56 (Palumbo dec.) ¶ 8.

[202] PX 56 (Palumbo dec.) ¶ 17 ("Mountain America Credit Union (MACU) reported suspicious activity to the Division related to hundreds of accounts opened by Thomas Riskas.").

[203] PX 80; PX 85.

[204] PX 71, Att. B.

[205] PX 75; PX 80.

Services.[206]  He also acts as the face of the Business Coaching Program in welcome messages

and videos to consumers, and receives and responds to inquiries and complaints from

government agencies and Better Business Bureaus on behalf of Defendants.[207]

## III.   LEGAL ARGUMENT

Defendants have deceived hundreds of consumers out of millions of dollars through their

Work-At-Home Kits, Business Coaching Program, and Add-On Services.  They promise to assist

consumers to establish or provide consumers with home-based Internet businesses that will earn

thousands of dollars a month, but do not deliver on those promises.  Instead, through aggressive

and deceptive sales tactics, Defendants sell a series of goods and services that lead consumers

down a path of increasing costs and debts with little, if any, value in return.  Congress has

charged the FTC with enforcing the FTC Act and protecting consumers from "unfair or

deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1)(2).  As outlined in

this memorandum, Defendants' scheme is the epitome of a deceptive scheme.

To put an immediate stop to Defendants' deceptive scheme and to preserve the possibility

of effective final relief for consumers, the FTC requests that the Court issue an *ex parte* TRO

with provisions for asset and document preservation, the appointment of a receiver,[208] expedited

---

[206] PX 34; PX 72 at EVO-POWERPAY000492.

[207] *See, e.g.,* PX 22 at UT-BBB-00005; at PX 4 (Black dec.), Ex. D; PX 3 (Bechen dec.), Ex. F; PX 15 (McLennan dec.), Ex. D; PX 22, at UT-BBB-000152.

[208] The FTC recommends Robb Evans & Associates LLC as temporary receiver for the Defendants.  The firm's qualifications are set forth in the FTC's Recommendation for Temporary

discovery, immediate access to Defendants' business premises and records, and an order to show

cause why a preliminary injunction should not issue.  The Court has the power to order the relief

sought, the evidence demonstrates that the FTC is likely to succeed on the merits of its case, and

the equities weigh decisively in favor of the requested relief.

A.      SECTION 13(b) OF THE FTC ACT AUTHORIZES THIS COURT TO
        GRANT THE REQUESTED RELIEF.

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), gives the FTC authority to seek, and the

district court authority to grant, both a permanent injunction against violations of any provisions

of law enforced by the FTC and "any ancillary relief necessary to accomplish complete justice."

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982).  This ancillary relief may

encompass "the full range of equitable remedies," including a temporary restraining order,

appointment of a receiver, an asset freeze, or any other measures that the Court deems necessary

to protect consumers and preserve the possibility for permanent relief. *FTC v. Freecom*

*Commc'ns, Inc.,* 401 F.3d 1192, 1202 n.6 (10th Cir. 2005); *see also Skybiz.com*, 2001 U.S. Dist.

LEXIS 26175, at *23 (granting preliminary injunction following *ex parte* TRO with asset freeze

and appointment of temporary receiver) *aff'd* 57 Fed. Appx. 374, 378 (10th Cir. 2003); *FTC v.*

*Affordable Media, LLC*, 179 F.3d 1228, 1232 & n.2 (9th Cir. 1999) (granting *ex parte* TRO and

preliminary injunction including asset freeze); *FTC v. Am. Nat'l Cellular, Inc.,* 810 F.2d 1511,

1512 (9th Cir. 1987) (holding that FTC's authority to seek TRO and preliminary injunction,

including asset freeze and appointment of a receiver, is constitutional).  A court's exercise of this

---

Receiver, filed simultaneously with this Motion. The firm has been a court-appointed receiver in
numerous § 5 cases, including, *FTC v. Ivy Capital, Inc.*, No. 11cv283 (D. Nev.); *FTC v. Johnson*,
No. 10cv2203 (D. Nev); and *FTC v. Skybiz.com, Inc.*, No. 01cv396K(E), 2001 U.S. Dist. LEXIS
26175, *40-41 (D. Okla. Aug 31, 2001) *aff'd*, 57 Fed. Appx. 374 (10th Cir. 2003).

broad equitable authority is particularly appropriate where, as in this instance, the public interest

is at stake, *Porter* v. *Warner Holding Co.*, 328 U.S. 395, 398 (1946), and thus a court's equitable

powers "assume an even broader and more flexible character than when only a private

controversy is at stake." *Skybiz.com*, 2001 U.S. Dist. LEXIS 26175, at *23-24.

In determining whether to grant a temporary restraining order or other preliminary relief

under Section 13(b), 15 U.S.C. § 53(b), a court must consider two factors: (1) the FTC's

likelihood of ultimate success, and (2) whether the public equities outweigh any private equities.

*Skybiz.com*, 2001 U.S. Dist. LEXIS 26175, at *21-22; *Affordable Media*, 179 F.3d at 1233.

Unlike private litigants, the FTC is not required to establish irreparable injury, which is

presumed in an enforcement action under the FTC Act. *Skybiz.com,* 2001 U.S. Dist. LEXIS

26175, at *21-22; *FTC* v. *World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989).  Finally,

in balancing the equities, the public interest receives far greater weight than private ones.  *Id.*

The evidence in the record demonstrates that the FTC is likely to succeed on the merits of

its claims that Defendants have violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the

TSR, 16 C.F.R. Part 310.  Further, the record illustrates that the equities weigh heavily in favor

of the requested relief.

    **B.**    **THE FTC HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS AND THE EQUITIES WEIGH IN FAVOR OF THE REQUESTED RELIEF.**

    **1.**    **The FTC Has Demonstrated a Likelihood of Success in Establishing That Defendants Have Violated Section 5 of the FTC Act.**

Defendants have engaged in numerous deceptive acts and practices within the meaning of Section 5 of the FTC Act, 15 U.S.C. § 45(a).  Section 5 prohibits unfair or deceptive acts or practices in or affecting commerce.  "An act or practice is 'deceptive' if it involves a material representation or omission that is likely to mislead consumers, acting reasonably under the circumstances, to their detriment."  *FTC v. Loanpointe, LLC,* No. 2:10-CV-225DAK, 2011 U.S. Dist. LEXIS 104982, *10 (D. Utah Sep. 16, 2011); *FTC v. Pantron I Corp.,* 33 F.3d 1088, 1095 (9th Cir. 1994).  A representation or omission is material if the information conveyed is important to consumers and thus likely to affect their choice or conduct toward Defendants' product or service.  *FTC v. Mallett,* 818 F. Supp. 2d 142, 148 (D.D.C. 2011).  Representations or omissions may be either express or implied, and if deliberately used to induce the purchase of a product or service they are presumed to be material.  *FTC v. Home Assure,* No. 8:09-cv-547-T-23TBM, 2009 U.S. Dist. LEXIS 32053, *14, n.8 (M.D. Fla. Apr. 8, 2009); *see also Loanpointe*, 2011 U.S. Dist. LEXIS 104982, at *10 ("Express and deliberate claims are presumed to be material.").  An ad or sales pitch may also be deceptive "by virtue of the net impression it creates," even if it contains some truthful disclaimers or disclosures. *FTC v. Cyberspace.com, LLC,* 453 F.3d 1196, 1200 (9th Cir. 2006); *FTC v. Grant Connect, LLC,* 2:09-CV-01349-PMP-RJJ, 2009 U.S. Dist. LEXIS 94201, *24 (D. Nev. Sep. 22, 2009).

The FTC can prove that a representation is likely to mislead consumers in either of two ways.  First, the FTC can prove that the message conveyed by Defendants' express or implied representations is, in fact, false.  False claims are inherently "likely to mislead." *In the Matter of Thompson Med. Co. Inc.,* 104 F.T.C. 648, 788 (1984*), aff'd*, *Thompson Medical Co., Inc. v. FTC*, 791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987).  Second, the FTC can prove

that the Defendants lacked a reasonable basis for asserting that the message was true. *Thompson Medical*, 791 F.2d at 193. The FTC does not have to show that all consumers were deceived. *See FTC v. Kuykendall*, 371 F.3d 745, 765 (10th Cir. 2009) (holding that the FTC need not show individual consumer injury); *Freecom Commc'ns,* 401 F.3d at 1205-06; (same); *McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000) (same); *FTC v. Figgie Int'l*, 994 F.2d 595, 605 (9th Cir. 1993) (same); *FTC v. Amy Travel Serv., Inc.*, 875 F. 2d 564, 572 (7th Cir. 1989) ("[T]he FTC need not prove that every consumer was injured. The existence of some satisfied customers does not constitute a defense under the FTCA.").

Moreover, because the purpose of Section 5 is to protect consumers rather than necessarily punish wrongdoers, the FTC is not required to show that the Defendants here possessed the intent to deceive. *Freecom Commc'ns,* 401 F.3d at 1202; *FTC* v. *World Travel Vacation Brokers, Inc.*, 861 F.2d 1021, 1029 (7th Cir. 1988). Instead, "the 'cardinal factor' in determining whether an act or practice is deceptive under § 5 is the *likely effect* the promoter's handiwork will have on the mind of the ordinary consumer" (emphasis added). *Freecom Commc'ns,* 401 F.3d at 1202 (quoting *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963)). Even so, proof that consumers were actually deceived is "highly probative" to show that a practice is likely to mislead consumers acting reasonably under the circumstances. *Cyberspace.com*, 453 F.3d at 1201.

        a)      **Defendants Misrepresent That Consumers Will Earn Thousands of Dollars per Month by Using Their Work-At-Home Kits, the Business Coaching Program, and the Add-On Services.**

Count I of the Complaint alleges that Defendants' representations that consumers who purchase the Work-At-Home Kits, the Business Coaching Program, and the Add-On Services are likely to earn thousands of dollars a month are false or misleading or were not substantiated at the time the representations were made.  Misrepresentations regarding anticipated earnings are "material and likely to mislead consumers because such representations strike at the heart of a consumer's purchasing decision." *Freecom Commc'ns, Inc.,* 401 F.3d at 1203.  Even if Defendants do not consistently guarantee that consumers will achieve a certain level of earnings, claims about the *potential* of a money-making system, such as Defendants' Work-At-Home Kits and Business Coaching Program, are presumed to be material.  *FTC v. Febre,* No. 94 C 3625, 1996 U.S. Dist. LEXIS 9487, *8 (N.D. Ill. July 3, 1996); *see also Kraft, Inc. v. FTC*, 970 F.2d 311, 322-23 (7th Cir. 1992) (discussing the presumed materiality of certain representations).  Regardless, Defendants frequently make explicit earnings claims, and under law those claims are material.

As detailed *supra*, Section II (A) (1) of this memorandum, Defendants, in Phase 1 of their scheme, create and disseminate numerous Work-At-Home-Kit Websites designed to make consumers believe that they can earn a significant income by using Defendants' Work-At-Home Kits.  Defendants' Work-At-Home-Kit Websites are rife with explicit earnings claims, such as that a consumer can spend 60 minutes a day and be "guaranteed" to earn $379 a day;[209] and that a consumer can earn $7,500 per month by posting affiliate links.[210]  Defendants' earnings claims are further buttressed via sham testimonials from supposed program participants such as "Sally

---

[209] PX 26 at FTC-CD-1809-1810.

[210] PX 26 at FTC-CD-1811-1812.

Brown," "Jessica Bradley," and "Josh H."[211]  Consumers, by the hundreds, end up spending as

much as $99 each to purchase Defendants' Work-At-Home Kits.[212]

As the facts outlined, *supra*, in Section  II (A)(1) show, Defendants' earnings claims are

false and the testimonials fake.  When consumers actually try to use Defendants' Work-At-Home

Kit, most find that it is nearly impossible to earn a significant income via the Kit, and discover

that much of the Work-At-Home Kit and Training Website is designed primarily to sell them

additional products and services or lure them into calling for "startup support," which inevitably

leads to a telemarketing sales pitch for Defendants' more costly Business Coaching Program.[213]

Similarly, as detailed *supra*, Section II (A)(2)(b)(i), Defendants, during telemarketing

sales calls, make numerous earnings claims to consumers regarding Defendants' Business

Coaching Program and Add-On Services.  These claims include explicit representations, such as

that consumers will be able to earn between $2,000 and $5,000 a month and be able to pay off

the Program cost—typically $1,895 to $14,495,[214]—within a few months, and deliberately

implied claims, such as that numerous other participants are earning thousands a month, that they

---

[211] *Id.*; *see also* Section II (A)(1).

[212] In addition to paying for the Work-At-Home Kit, consumers are also charged a recurring fee of $8.78 for website maintenance.  PX 43, ¶ 18.

[213] Membersonlytraining.com screen captures – Ex. 4; PX 25 (Tyndall dec.) ¶¶ 23-25 (clicking on Training Website pages and videos leads to additional sales offers); PX 52 (FTC-CD-002315:11-12; PX 32 at FTC-CD-001910, line 15; PX 56 (Palumbo dec.) ¶ 11; PX 4 (Black dec.) ¶3; PX 6 (Cartwright dec.) ¶ 6.

[214] *See* PX 69 at Utah 000926.

themselves are earning thousands a month, and that the vast majority of program participants end up with a profitable online business.

And yet as shown *supra,* Section II (A)(2)(b)(ii), few consumers earn a substantial income from their new "businesses," and certainly do not earn the thousands of dollars a month promised by the Defendants. Most consumers who purchased the Business Coaching Program lost their initial investments, plus all the interest paid (which continues to accrue for many consumers) for Defendants' charges to their credit cards or loans that Defendants facilitated through third parties. No matter how hard they worked at Defendants' Program, none of the consumer declarants recouped their initial investment, or even came close to doing so, let alone the money promised them in Defendants' sales pitches. Consumers who purchased many of the Add-On Services fared no better, despite their additional investment of thousands of dollars and continued efforts to follow the Program.

Defendants' false earnings claims are material misrepresentations likely to mislead consumers acting reasonably under the circumstances. Moreover, Defendants' misrepresentations *have* misled consumers acting reasonably under the circumstances, as demonstrated in the numerous consumer complaints and declarations submitted by the FTC in support of its motion. The FTC has therefore demonstrated an overwhelming likelihood of success on the merits of Count I.

> **b)** **Defendants Misrepresent What Products and Services Consumers Will Receive and How Much They Will Have to Pay.**

Count II of the Complaint alleges that Defendants have misrepresented characteristics of the Business Coaching Program and Add-On Services, including (a) that the Business Coaching Program was the only good or service that consumers would need to buy in order to end up with

a successful online business; (b) that consumers would end up with a fully operational website

capable of generating substantial traffic and sales; and (c) that consumers' successful use of the

Business Coaching Program depended on their purchase of Add-On Services.

As detailed *supra*, Section II (A)(2)(c), Defendants typically tell consumers, during the

second phase of the scheme, that the Business Coaching Program is "all inclusive" and will be

the only major expense required of them in order to establish an online business. Defendants

also promise consumers that if they purchase the Business Coaching Program, they will receive

expert guidance, a successful website, and *all* of the services necessary to get their online

businesses up and running and making money.[215] Instead, consumers typically receive scanty

guidance from their coaches, unhelpful video tutorials, and end up with malfunctioning, non-

operational, or non-existent, websites.[216] And as shown *supra*, Section II (A)(3), consumers are

later told, during phase three of Defendants' scheme, that in order to actually end up with what

they were promised via the Business Coaching Program —a functioning, legal, and profitable

---

[215] PX 6 (Cartwright dec.) ¶ 18; PX 16 (Ortmeier dec.) ¶ 6; PX 18 (Staropoli dec.) ¶¶ 8,11; PX 14 (McDonald dec.) ¶ 10; PX 2 (Athnos dec.) ¶ 4; PX 7 (Cruz dec. ¶ 10); PX 12 (Mack dec.) ¶ 14, 17-18; PX 8 (Davis dec.) ¶ 5; PX 10 (Jelke dec.) ¶ 7; TX 19 (Telle dec.) ¶ 14; PX 4 (Black dec.) ¶ 5, PX 13 (Maryak dec.) ¶ 5.

[216] *See, e.g.,* PX 16 (Ortmeier dec.) ¶ 24; PX 2 (Athnos dec.) ¶¶ 11, 13-14; PX 5 (Blackwell dec.) ¶¶ 16,18, 20, 29; PX 9 (Didier dec.) ¶ 27, ¶ 32; PX 10 (Jelke dec.) ¶¶ 11, 14, 27; PX 13 (Maryak dec.) ¶¶ 11, 21; PX 14 (McDonald dec.) ¶¶ 15-16; PX 4 (Black dec.) ¶¶ 20, 29-30, 32; PX 6 (Cartwright dec.) ¶ 34; PX 15 (McLellan dec.) ¶ 15; PX 18 (Staropoli dec.) ¶¶ 10-11; PX 8 (Davis dec.) ¶¶ 9-10; PX 3 (Bechen dec.) ¶ 22; PX 21 (Yandow dec.) ¶¶ 20, 27; PX 1 (Anderson dec.) ¶¶ 9-10; PX 11 (Lower dec.) ¶ 17; PX 17 (Squires dec.) ¶¶ 22, 24.

business—they will have to spend thousands more for various Add-On Services.[217]  Defendants

misrepresent that these Add-On Services are part of or integral to the Business Coaching

Program, and that if they do not purchase Add-On Services, the online business and website they

are purportedly developing through the Business Coaching Program will not earn any money.

And yet, since Defendants do not actually provide consumers with a viable online business or

website or help them achieve that goal, purchase of the Add-On Services does little to help

consumers achieve a legal, successful, and profitable business.

These misrepresentations regarding the goods and services consumers will receive, and

how much consumers will have to pay for them, are material and have a significant influence

over consumers' purchasing decisions. *See, e.g., FTC v. John Beck Amazing Profits, LLC*, 865 F.

Supp. 2d 1052, 1067 (C.D. Cal. 2012) ("A claim is material if it 'involves information that is

important to consumers and, hence, likely to affect their choice of, or conduct regarding, a

product.'" (quoting *Cyberspace.com*, 453 F.3d at 1201)).  Moreover, the fact that so many

consumers attest to the fact that they actually were deceived demonstrates that Defendants'

misrepresentations were likely to mislead consumers, acting reasonably under the circumstances,

to their detriment.  The FTC has therefore demonstrated an overwhelming likelihood of success

on the merits of Count II.

>    **2.      The FTC Has Demonstrated a Likelihood of Success in Establishing That
>            Defendants Have Violated the TSR.**

---

[217] *See, e.g.,* PX 16 (Ortmeier dec.) ¶¶ 6, 12, 17-18; PX 3 (Bechen dec.) ¶ 22; PX 6 (Cartwright
dec.) ¶¶ 18, 29; PX 7 (Cruz dec.) ¶¶ 16, 23, 29; PX 4 (Black dec.) ¶ 24; PX 19 (Telle dec.) ¶ 27;
TX 17 (Squires dec.) ¶ 12; PX 9 (Didier dec.) ¶ 28; PX 12 (Mack dec.) ¶ 20-25, 29; PX 14
(McDonald dec.) ¶ 17; PX 5 (Blackwell dec.) ¶¶ 10, 15; PX 1 (Anderson dec.) ¶ 11; PX 11
(Lower dec.) ¶ 10 ; PX 6 (Cartwright dec.) ¶ 29.

Defendants have engaged in numerous deceptive acts and practices within the meaning of the Telemarketing Sales Rule, 16 C.F.R. Part 310.  Defendants are "sellers" and "telemarketers" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(aa), (cc), and (dd), and thus are prohibited from, among other things:

- misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability, 16 C.F.R. § 310.3(a)(2)(vi);

- misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer, 16 C.F.R. § 310.3(a)(2)(iii); and

- making a false or misleading statement to induce any person to pay for goods or services, 16 C.F.R. § 310.3(a)(4).

A violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). *See* Sections 3(c) and 6 of the Telemarketing Act, 15 U.S.C. § 6102(c) and 6105(b), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3); *see also FTC v. Stefanchik*, 559 F.3d 924, 930 (9th Cir. 2009) (recognizing that violation of the TSR is a violation of § 5 of the FTC Act, 15 U.S.C. § 45(a)); *U.S. v. Dish Network, LLC*, 667 F. Supp. 2d 952, 955 (N.D. Ill. 2009) (same).

The evidence submitted by the FTC establishes that Defendants have violated the prohibitions listed above, and thus are in violation of the TSR, 16 C.F.R. Part 310, and Section 5 of the FTC Act.

### a) Defendants Have Misrepresented Material Aspects of an Investment Opportunity in Connection with Telemarketing.

Count III of the Complaint alleges that in numerous instances, in connection with telemarketing, Defendants have misrepresented, directly or by implication, material aspects of investment opportunities, including, but not limited to, the risk, liquidity, earnings potential, or profitability of Defendants' Business Coaching Program and Add-On Services. The TSR defines an "investment opportunity" as "anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation." 16 C.F.R. § 310.2(q). Defendants' goods and services, including Defendants' Business Coaching Program and Add-On Services, are "investment opportunit[ies]" as defined in the TSR because, as detailed *supra,* Section II (A)(2)(b)(i), Defendants sell their goods and services over the telephone based wholly or in part on consistent and repeated representations that consumers are likely to earn thousands of dollars a month in future income. And yet as detailed *supra*, Section II (A)(2)(b)(ii), and explained *supra*, Section III(B)(1)(a), few consumers earn a substantial income from their new "businesses," and almost never earn the thousands of dollars a month promised by the Defendants.

The FTC has therefore demonstrated an overwhelming likelihood of success on the merits of Count III.

### b) Defendants Have Misrepresented the Performance, Efficacy, Nature, or Essential Characteristics of Goods and Services.

In Count IV of the Complaint, the FTC alleges that in connection with telemarketing, Defendants have misrepresented, directly or by implication, material aspects of the performance,

efficacy, nature, or central characteristics of Defendants' Business Coaching Program and Add-On Services, including that:

    A.    the Business Coaching Program was the only good or service that consumers would need to buy in order to end up with a successful online business;

    B.    consumers would end up with a fully operational website capable of generating substantial traffic and sales; and,

    C.    consumers' successful use of the Business Coaching Program depended on their purchase of Add-On Services.

As detailed *supra*, Section II (A)(2)(c), and explained *supra* Section III (B)(1)(b), Defendants typically tell consumers that the Business Coaching Program will be the only expense required of them in order to end up with a  successful online business, and that if they purchase and use the Business Coaching Program, they will end up with a fully operational website capable of generating substantial traffic and sales.  Instead, consumers receive little guidance, unhelpful video tutorials, and end up with malfunctioning, non-operational, or non-existent websites.  And as shown *supra*, Section II (A)(3), consumers are later told that in order to actually end up with a functioning, legal, and profitable business they will have to spend thousands more for Add-On Services.

Furthermore, as shown *supra*, Sections II (A)(2) and II (A)(3), consumers do not typically end up with a viable online business even if they do purchase the Add-On Services, and

the purchase of the Add-On Services does little or nothing to help consumers end up with a legal, successful, and profitable business.

The FTC has therefore demonstrated an overwhelming likelihood of success on Count IV.

### 3. The Equities Weigh in Favor of Granting Injunctive Relief.

Not only has the FTC demonstrated a likelihood of success on the merits for each count of its Complaint, but the balance of the equities tip decidedly in favor of the public interest. When balancing public and private interests, "the public interest should receive greater weight." *World Wide Factors*, 882 F.2d at 347. Furthermore, defendants "can have no vested interest in a business activity found to be illegal." *United States v. Diapulse Corp. of America*, 457 F.2d 25, 29 (2d Cir. 1972). The FTC's interests in protecting consumers from harm, enforcing the law, and preserving Defendants' assets for consumer redress greatly outweigh any private interests Defendants may possess.

Defendants have operated their deceptive scheme since at least 2009, and have illegally pocketed tens of millions of dollars from hundreds of consumers.[218] Consumers throughout the country invested, and lost, thousands of dollars each due to Defendants' misrepresentations.[219] Consumers have also lost time spent trying to disentangle themselves from companies that have barraged them with lengthy telemarketing pitches and endless credit card charges.[220] These consumers, who were interested in establishing online businesses, ended up defrauded by

---

[218] PX 71 (George dec.), Atts. A-E.

[219] *See* fn 73 *supra*.

[220] PX 1 (Anderson dec.) ¶¶ 11-15, 18-19; PX 2 (Athnos dec.) ¶¶ 9-10 and 15; PX 4 (Black dec.) ¶¶37-38.

Defendants who, for their own benefit, misrepresented what they were providing and the terms

of their offer.  Defendants were aware, as evidenced by the voluminous Better Business Bureau

complaints they received and responded to, State Attorneys General actions, and the termination

by their payment processor, that their marketing claims misled consumers.[221]  Nonetheless,

Defendants continued to promote their products and services in the same deceptive manner.  As

the evidence indicates, the public interest in protecting consumers from Defendants' illegal

practices far outweighs Defendants' private interest.

### C.   DEFENDANTS ARE A COMMON ENTERPRISE AND JOINTLY AND SEVERALLY LIABLE FOR THE LAW VIOLATIONS

The Corporate Defendants in this case operate as a common enterprise and may be held

jointly liable for the deceptive acts or practices of any other member of the enterprise.

*Loanpointe*, 2011 U.S. Dist. LEXIS 104982, at *24-25.  When determining whether a common

enterprise exists, "the pattern and frame-work of the whole enterprise must be taken into

consideration." *FTC v. Direct Benefits Group, LLC*, No. 6:11-cv-1186, 2013 U.S. Dist. LEXIS

100593, *53 (M.D. Fla. July 18, 2013) (internal quotation marks and citation omitted).

There are two principal ways in which a group of corporate defendants may be deemed a

common enterprise in cases brought under the FTC Act.  The first manner, sometimes referred to

---

[221] *See* PX 22 (Utah Better Business Bureau complaints); PX 24 (Idaho Better Business Bureau complaints); PX 74 (State of Ohio complaint); PX 73 (State of Idaho complaint); PX 72 (Bilotti dec.); PX 56 (Palumbo dec.) ¶4 ("Since at least June 2012, the Utah Division of Consumer Protection received numerous consumer complaints against Apply Knowledge, Novus North, LLC, EVI, LLC dba Members Learning Center and various associated entities. The complaints focus on telemarketing phone calls made on behalf of Apply Knowledge or for the purpose of selling Apply Knowledge products and services.").

as a common enterprise by virtue of "horizontal commonality," exists when there is "no real distinction" between corporate defendants. *FTC v. Network Services Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010); *FTC v. Wolf,* No. 94-8119-CIV, 1996 U.S. Dist. LEXIS 1760, *23 (S.D. Fla. Jan. 30, 1996). This occurs when corporate entities share resources and personnel, such as office space and officers, corporate funds, unified advertising, and common control, among other things. *Skybiz.com*, 2001 U.S. Dist. LEXIS 26175, at *14; *see also Loanpointe*, 2011 U.S. Dist. LEXIS 104982, at *25 (holding that to determine whether a common enterprise exists, courts look at a variety of factors including common control, common office space and employees, and the commingling of funds). Another significant indicator of a common enterprise is the conduct of corporate business through a "maze of interrelated companies." *Wolf,* 1996 U.S. Dist. LEXIS 1760, at 22-23.

The second manner of common enterprise, sometimes referred to as "vertical commonality," occurs when corporate entities possess "strongly interdependent economic interests," such that each entity's fortunes essentially rise and fall with the others as part of a "shared business scheme." *Network Services Depot*, 617 F.3d at 1143; s*ee also Direct Benefits Group*, 2013 U.S. Dist. LEXIS 100593, at *54; *Grant Connect,* 827 F. Supp. 2d at 1216; *SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1130 (9th Cir. 1991); *U.S. v. ACB Sales & Service, Inc.*, 590 F. Supp. 561, 575 (D. Ariz. 1984) (describing a maze of corporate debt collection operations and holding that they act as a common, economic enterprise, despite distinct corporate identities). Such commonality can be demonstrated through clearly "concerted and coordinated" activity, *Grant Connect*, 827 F. Supp. 2d at 1217-18, when profits are interdependent, *Id.,* or

when different entities are used to "conceal assets and facilitate the scam." *FTC v. Skybiz.com, Inc.*, No. 01-CV-396, 2001 U.S. Dist. LEXIS 26314, *15-16 (N.D. Okla. Aug. 2, 2001). In the instant matter, the Defendants qualify as a common enterprise under both the horizontal and vertical forms of commonality.

Corporate Defendants Dominion, eCommerce Support, Novus North, Essent Media, Vensure, 365DailyFit, VI Education, EVI, Dahm, Purple Buffalo, and Nemrow Consulting are a common enterprise in the horizontal sense in that these entities share, in whole or in part, common control, location, office space, and officers.[222]  These companies are all owned or controlled, in whole or in part, by Defendants Gannuscia, Bjarnson, Riskas, Nicol, Huntsman, and Nemrow, and can be referred to as the "Gannuscia companies."[223]

Likewise, Corporate Defendants Apply Knowledge (d/b/a the Coaching Department), eVertex Solutions, and Supplier Source are a common enterprise in the horizontal sense in that these entities share common control, location, office space, and officers.  These companies are

---

[222] Defendants Essent Media, Novus North, Vensure, VI Education, and 365DailyFit all operate from the same building.  Upon information and belief, the registered corporate offices for these and other entities involved in the common enterprise are post office boxes, virtual offices, or home addresses.

[223] *See, supra,* Section II(B)(1) and (2), detailing the connections between Defendants Gannuscia, Bjarnson, Riskas, Nicol, Huntsman, and Nemrow and Corporate Defendants Dominion, eCommerce Support, Novus North, Essent Media, Vensure, 365DailyFit, VI Education, EVI, Dahm, Purple Buffalo, and Nemrow Consulting.

all owned or controlled by Ken Sonnenberg or Babata Sonnenberg, and can be referred to as the "Sonnenberg companies."[224]

While the Gannuscia and Sonnenberg companies do not share common control, office space, and officers, etc. *with each other*, the two sets of companies are totally dependent on one another. The two groups work cooperatively and complement each other as part of the same overarching unlawful scheme, with each corporate entity providing an integral link in Defendants' three-phase unlawful scheme. *See Direct Benefits Group,* 2013 U.S. Dist. LEXIS 100593, at *55 (discussing defendant corporate entities' mutually supportive roles in debiting scheme and holding that entities operated as common enterprise); *see also Wolf,* 1996 U.S. Dist. LEXIS 1760, at 22-23 (holding that a significant indicator of a common enterprise is the conduct of corporate business through a "maze of interrelated companies").

The Gannuscia companies handle the merchant accounts, lead generation, and telemarketing phases, thus locating consumers (leads) and convincing them—via deceptive marketing— to buy Work-At-Home Kits and the Business Coaching Program. Once consumers purchase the Business Coaching Program from the Gannuscia companies, the Sonnenberg companies provide consumers with their purported coaches and customer service. The Sonnenberg companies also maintain customer records and handle Business Coaching Program responses to consumer complaints, Better Business Bureau inquiries, and credit card disputes that consumers file to get their money back. The Sonnenberg companies' coaches also advise

---

[224] *See, supra,* Section II(B)(1) and (2), detailing the connections between Ken Sonnenberg and Babata Sonnenberg and Corporate Defendants Apply Knowledge (d/b/a the Coaching Department), eVertex Solutions, and Supplier Source.

and arrange for consumers to purchase Add-On Services, which both the Sonnenberg and

Gannuscia companies, among others, market.

The profits generated by the scheme are shared between the two sets of companies, and

bank records reflect millions of dollars in transfers between the Gannuscia and Sonnenberg

entities,[225] evidencing both the interconnectedness of the two groups, and the potential for each

set to serve as "conduits for improper cash flow" generated by the unlawful scheme, one of the

marks of a common enterprise.[226] *See Skybiz.com*, No. 01-CV-396, 2001 U.S. Dist. LEXIS

26314, *15-16  (holding that companies that may serve as conduits for common enterprise cash

flow,  although not directly involved in substance of deceptive scheme, were properly subject to

preliminary injunction).

The Gannuscia companies and Sonnenberg companies together constitute a common

enterprise as found where, despite a lack of common ownership, the entities possess "strongly

interdependent economic interests," a pooling of assets and revenues, *Network Services Depot*,

617 F.3d at 1142-43, or there "is an arrangement to share profits on a percentage basis between

the investor and the promoter." *R.G. Reynolds*, 952 F.2d at 1130; *see also Grant Connect*, 827 F.

Supp. 2d at 1213 (rejecting defendants' arguments against the finding of a common enterprise,

instead holding that, "[e]ven if Defendants had their own phone numbers, bank accounts, and

paid their own bills, that would not preclude a common enterprise finding").  The Sonnenberg

companies do not profit unless the Gannuscia companies find consumers (leads) and convince

---

[225] PX 71 George dec.), Att. C.

[226] *Id.*

them to buy the Business Coaching Program.  The Gannuscia companies, meanwhile, need the

Sonnenberg companies to provide the so-called coaching services and customer support, to keep

consumers believing in the program while they and others pitch Add-On Services, and to rebut

consumer credit card disputes and thus prevent costly chargebacks.

Quite simply, the fortunes of the Gannuscia Companies and the fortunes of the

Sonnenberg companies rise and fall together as a single common enterprise operating a complex,

multi-phase, deceptive marketing scheme.

### D.   INDIVIDUAL DEFENDANTS ARE LIABLE FOR INJUNCTIVE AND MONETARY RELIEF.

Individual Defendants, Bevan, Bjarnson, Gannuscia, Huntsman, Nemrow, Nicol, Riskas,

and Babata and Ken Sonnenberg, are liable for injunctive and monetary relief for law violations

committed by the Corporate Defendants.  Under the FTC Act, "a principal is liable for

misrepresentations made by his or her agents (*i.e.*, those with the actual or apparent authority to

make such representations) regardless of the unsuccessful efforts of the principal to prevent such

misrepresentations."); *Skybiz.com*, 2001 U.S. Dist. LEXIS 26175, at *25.  To obtain an

injunction against an individual, for corporate conduct, the FTC must show that the individual

either had the authority to control the unlawful activities or participated directly in them.

*Freecom Commc'ns*, 401 F.3d at 1205 ("Once the FTC presented evidence defendants violated

§ 5, it only had to show [the individual] had the authority to control [corporate] defendants to

establish its case for injunctive relief against him."); *Affordable Media*, 179 F.3d at 1234; *FTC v.

Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996); *Amy Travel*, 875 F.2d at 574.  The FTC is

not required to show that a defendant intended to defraud consumers in order to hold that

individual personally liable. *Skybiz.com*, 2001 U.S. Dist. LEXIS 26175, at *32.  In general, an

individual's status as a corporate officer gives rise to a presumption of liability to control a small,

closely held corporation. *Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973),

*cert. denied*, 414 U.S. 828 (1973); *John Beck Amazing Profits*, 865 F. Supp. 2d at 1080.  More

particularly, assuming the duties of a corporate officer is probative of an individual's

participation or authority. *Amy Travel*, 875 F.2d at 573; *FTC v. Five-Star Auto Club, Inc.*, 97 F.

Supp. 2d 502, 538 (S.D.N.Y. 2000).

      For an individual to be liable for monetary relief (consumer redress) for corporate

conduct, the individual must have had, or should have had, knowledge or awareness of the

corporate defendants' misrepresentations. *Freecom Commc'ns*, 401 F.3d at 1207 (sufficient for

the FTC to show the individual had or should have had knowledge or awareness of corporate

violations); *Affordable Media*, 179 F.3d at 1231; *Gem Merch.*, 87 F.3d at 470; *Amy Travel*, 875

F.2d at 574.  This knowledge element, however, need not rise to the level of subjective intent to

defraud consumers. *Freecom Commc'ns*, 401 F.3d at 1207; *Affordable Media*, 179 F.3d at 1234;

*Amy Travel*, 875 F.2d 574.  Instead, the FTC need only demonstrate that the individual had

actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of

such representations, or an awareness of a high probability of fraud coupled with the intentional

avoidance of the truth. *Affordable Media*, 179 F.2d at 1234; *Amy Travel*, 875 F.2d at 574.

Participation in corporate affairs is probative of knowledge. *Affordable Media*, 179 F.3d at 1235;

*Amy Travel*, 875 F.2d at 574.  Courts have found that individuals involved in the management,

operations, technology, and finances, among other areas, of fraudulent corporate schemes may be

held personally liable for consumer redress. *See, e.g., John Beck Amazing Profits*, 865 F. Supp.

2d at 1080-82 (holding individuals liable for consumer redress, for corporate acts, based, in part,

on their status as principals of closely held corporations); *FTC v. Commerce Planet, Inc.*, 878 F.

Supp. 2d 1048, 1081-83 (C.D. Cal. 2012) (holding corporate president's knowledge of corporate

operations established his reckless indifference, at a minimum, to corporations' deceptive

practices).

Here, as discussed earlier in Section II B(2), *supra,* at relevant times, all nine individuals

have been officers or members (owners) of at least one, closely held, corporate defendant, or

have had *de facto* control over at least one such defendant.  Additionally, each of the Individual

Defendants has exercised control over one or more of the Corporate Defendants' operations,

directing business objectives and practices, dealing with regulatory matters, addressing

government and consumer complaints, or taking responsibility for banking, payment, guaranty,

or other financial matters.

In addition, each Individual Defendant profited from the deception.[227]  The evidence

amply demonstrates that each Individual Defendant has the requisite control over one or more of

the Corporate Defendants' acts or practices to be liable for both injunctive and monetary relief.

> ### E.   AN *EX PARTE* TRO WITH ADDITIONAL EQUITABLE RELIEF IS NECESSARY TO PRESERVE EFFECTIVE FINAL RELIEF.

As part of the permanent relief in this case, the FTC seeks restitution for the consumer

victims of Defendants' scheme.  To preserve the possibility of such relief, the FTC seeks a TRO

with an immediate freeze of Defendants' assets, the appointment of a temporary receiver, access

---

[227] PX 71 (George dec.), Atts. C-E.

to Defendants' business premises and records, and expedited discovery.  Absent such relief, there

is a substantial risk that Defendants will continue to operate their fraudulent scheme, dissipate

their assets, and destroy documents to preclude satisfaction of any final order requiring monetary

relief.

### 1.   The Proposed TRO Should Be Entered *Ex Parte.*

Federal Rule of Civil Procedure 65(b) permits this Court to enter *ex parte* orders upon a

clear showing that "immediate and irreparable injury, loss, or damage will result to the movant"

if notice is given to defendants. Fed. R. Civ. P. 65(b)(1)(A).  Proper situations for *ex parte* relief

include situations where notice would "render fruitless further prosecution of the action." *In re*

*Vuitton et Fils*, 606 F.2d 1, 5 (2d Cir. 1979).  Consumer fraud cases such as this fall within the

category of situations where *ex parte* relief is not only appropriate, but necessary, to preserve the

possibility of full and effective final relief.  Courts in this district and others within the Tenth

Circuit have, on several occasions, issued *ex parte* temporary restraining orders in FTC

enforcement actions. *See e.g., FTC* v. *U.S. Hotline, Inc., et. al*, No. 93-cv-00444, Order granting

motion for temporary restraining order w/asset freeze & temporary receiver (dkt. No. 15) (D.

Utah 1993); *FTC* v. *Skybiz.com, Inc.*, No. 01-cv-00396, Temporary Restraining Order (dkt. No.

12) (N.D. Okla. 2001) noted at *FTC* v. *Skybiz.com, Inc.*, 2001 U.S. Dist. LEXIS 26175 *9; *FTC*

*v. Kuykendall,* No. 96-cv-00388 (W.D. Okla.), Order granting *ex parte*  temporary restraining

order with asset freeze (dkt. 17) (W.D. Okla. 1996) noted at *Kuykendall*, 312 F.3d at 1333.

As set forth in the Certification of Svetlana Gans in Support of *Ex Parte* Motion for

Temporary Restraining Order Pursuant to Rule 65(b), in the FTC's experience, defendants

involved in similar scams have secreted assets and destroyed documents upon learning of an impending federal action.  This experience strongly suggests that providing Defendants notice of this action would likely impair the FTC's ability to secure relief for consumers because of the very real possibility that Defendants will dissipate assets or destroy documents – a result that would cause immediate and irreparable harm.  It is therefore appropriate for this Court to grant the requested relief *ex parte*. *See AT&T Broadband v. Tech Comm'n., Inc.*, 381 F.3d 1309, 1319 (11th Cir. 2004) (holding that *ex parte* relief is appropriate where either the defendant or persons involved in similar activities have concealed evidence or disregarded court orders in the past).

### 2.  An Asset Freeze and a Temporary Receiver are Necessary.

A freeze of Defendants' assets is appropriate here to preserve the status quo by ensuring that funds do not disappear during the course of this action, and that Defendants cannot use their assets to continue their deceptive conduct.  An asset freeze should be imposed where the movant has shown that there exists a likelihood of success on the merits and a corresponding likelihood of dissipation of assets in the absence of an injunction. *Johnson v. Couturier*, 572 F.3d 1067, 1085 n.11 (9th Cir. 2009); *see also World Travel Vacation Brokers*, 861 F.2d at 1031 (holding that where Commission has shown likelihood of success on merits of individual liability for corporate restitution, freeze of individual assets is appropriate).  Defendants who have engaged in fraudulent violations may be considered likely to waste assets prior to resolution of the action. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972).

Defendants have operated a pervasive and deceptive scheme that has affected thousands of consumers and caused millions of dollars in consumer injury.  To operate this scheme, Defendants use a maze of corporate entities, including shell corporations, and multiple bank

accounts, which hold the proceeds from their deceptive acts.[228]  They use this complex web of

identities and accounts to confuse consumers and to prevent financial industry and law

enforcement officials from tracking their activities.  Defendants have opened a variety of

merchant accounts under shell company names with little or no resemblance to the Defendants'

companies.[229]  When Defendants' accounts are closed for high return rates, Defendants simply

establish new accounts under different names, but their underlying business practices remain the

same.  As stated, *supra*, in Section II (A) (4), in the face of mounting consumer complaints and

law enforcement scrutiny, Defendants establish new corporate entities but utilize the same

deceptive tactics.  Defendants, under newly created entities, utilize the same scripts, personnel

and business premises.[230]  Defendants have also opened hundreds merchant accounts to facilitate

the collection of payments from defrauded consumers.  In addition, Individual Defendant

Thomas Riskas opened over 100 shell accounts in 2013 alone, raising suspicions with his bank.

[231]  Individual Defendant Jeff Nicol established Defendant DAHM International on June 19, 2013

to bill consumers for the Business Coaching Program.[232]  By dispersing their chargebacks across

many accounts, Defendants actively attempt to conceal the deceptive nature of their acts and

---

[228] PX 56 (Palumbo dec.) ¶¶ 8, 17.

[229] *Id.*; *see also* PX 72 (Bilotti dec.), Att. A.

[230] PX 56 (Palumbo dec.) ¶ 10 ("These entities have occupied the same office spaces and used the same mailing addresses; they have also used virtually identical websites, contracts, and telemarketing phone scripts, often changing only the name.").

[231] PX 56 (Palumbo dec.) ¶17.

[232] PX 76; PX 92 (Hitt dec.) ¶ 8.

practices, making it difficult for credit card companies, consumers, and law enforcement alike to fully appreciate and understand Defendants' conduct.  Defendants who obtain money through deception are highly unlikely to voluntarily preserve assets for equitable redress in the absence of an asset freeze. *See* Rule 65 Certification of Svetlana S. Gans.

Indeed, Defendants have continued to deceptively market their products and services, in the face of complaints from hundreds of consumers.[233]  Law enforcement in three states, as noted previously, has brought actions against one or more of the Defendants for their deceptive acts, and yet Defendants persist in the same pattern of conduct and they are able to do so, in large part, because of their access to funds and other assets, much of which stem from their deceptive acts.[234]  These factors and common sense also strongly suggest that Defendants would dissipate assets, and the Court's ability to effectuate final relief will be undermined, without the protection of an immediate asset freeze.  *See* Rule 65 Certification of Svetlana S. Gans.

The appointment of a receiver for the Corporate Defendants, which is within this Court's equitable powers, is also critical. *Skybiz.com*, 2001 U.S. Dist. LEXIS 26175, at *23-24.  In cases in which a corporate defendant, through its management, has defrauded members of the public, "it is likely that in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste" to the detriment of the fraud's victims. *SEC v. First Fin. Group*, 645 F.2d 429, 438 (5th Cir. 1981).  As noted *supra*, page 81 district

---

[233] PX 43 (Jones dec.) ¶¶ 26-27.

[234] Defendants have garnered over $100 million from their deceptive activities.  PX 71 (George dec.) ¶ 12.  However, consumer injury is difficult to quantify at this time due to the Defendants' use of hundreds of merchant accounts.  The appointment of a receiver will be crucial to calculate total consumer injury and effectuate consumer redress.

courts in the Tenth Circuit have appointed receivers for corporate defendants in numerous FTC enforcement actions.

Appointment of a receiver is warranted here because Defendants' deceptive scheme demonstrates an indifference to the law that both the individuals and the corporations may reasonably be expected to frustrate the FTC's law enforcement efforts by destroying evidence and concealing or dissipating assets. A receiver can identify Corporate Defendants' assets, monitor the use of those assets, marshal and preserve records, determine the size and extent of the Defendants' deceptive conduct, and identify injured consumers that the FTC has not identified in its investigation.

The FTC recommends that the Court appoint Robb Evans & Associates LLC, as temporary receiver for the Corporate Defendants.  The firm's qualifications are set forth in the FTC's Recommendation for Temporary Receiver, filed simultaneously with this Motion. As part of the permanent relief in this case, the FTC seeks restitution for the consumer victims of Defendants' scheme.  To preserve the possibility of such relief, the FTC seeks a TRO with an immediate freeze of Defendants' assets, the appointment of a temporary receiver, access to Defendants' business premises and records, and expedited discovery.  Absent such relief, there is a substantial risk that Defendants will continue to operate their fraudulent scheme, dissipate their assets, and destroy documents to preclude satisfaction of any final order requiring monetary relief.

3.     **Expedited Discovery and Immediate Access to Defendants' Business Premises are Essential.**

In order to locate assets wrongfully obtained from defrauded consumers, the FTC respectfully requests that this Court permit expedited discovery, including immediate access to Defendants' business premises and records, and order financial reporting by Defendants.

District courts are authorized to depart from normal discovery procedures and fashion discovery by order to meet discovery needs in particular cases. Fed. R. Civ. P. 1, 26(d), and 34(b).  Moreover, the prompt and full disclosure of the scope and financial status of Defendants' business operations is necessary to ensure that the Court is fully advised regarding (1) the full range and extent of Defendants' law violations; (2) the identities of injured consumers; (3) the total amount of consumer injury; and (4) the nature, extent and location of Defendants' assets. For these reasons, the proposed Order requires that Defendants produce certain financial records and information on short notice, and requires financial institutions served with the order to disclose whether they are holding any of Defendants' assets.

This requested relief is necessary to identify and preserve assets Defendants wrongfully obtained from consumers. Any hardship on Defendants caused by the relief sought would be temporary and is greatly outweighed by the public's interest in preserving evidence and assets that Defendants' have obtained through their unlawful practices.

## IV.   CONCLUSION

For these reasons, the FTC respectfully requests that the Court grant its motion for an *ex parte* TRO with an asset freeze, appointment of a temporary receiver, and other equitable relief.

Respectfully submitted,

DAVID B. BARLOW
United States Attorney

Dated:  February 10, 2014

_____
JARED C. BENNETT
Assistant United States Attorney

General Counsel
Jonathan E. Nuechterlein

_____
Svetlana S. Gans (pro hac vice pending)
P. Connell McNulty (pro hac vice pending)
Federal Trade Commission
600 Pennsylvania Avenue, NW, H-286
Washington, DC 20580
Phone: (202) 326-3708
Fax:  (202) 326-3395
Email: sgans@ftc.gov
         pmcnulty@ftc.gov

Attorneys for Plaintiff
Federal Trade Commission