General Counsel
Jonathan E. Nuechterlein

Svetlana S. Gans, DC 478651
P. Connell McNulty, PA 87966
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop: H286
Washington, D.C. 20580
Tel. (202) 326-3708 (Gans)
Tel. (202) 326-2061 (McNulty)
Fax (202) 326-3395
sgans@ftc.gov; pmcnulty@ftc.gov

DAVID B. BARLOW, United States Attorney (#13117)
JARED C. BENNETT, Assistant United States Attorney (#9097)
185 South State Street, #300
Salt Lake City, Utah 84111
Tel. (801) 524-5682
Fax (801) 325-3340
Jared.Bennett@usdoj.gov

Attorneys for Plaintiff
Federal Trade Commission

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. |
| Plaintiff, | |
| vs. | CERTIFICATION OF PLAINTIFF'S COUNSEL SVETLANA S. GANS PURSUANT TO FED. R. CIV. P. |
| APPLY KNOWLEDGE, LLC, et al., | 65(b)(1) IN SUPPORT OF PLAINTIFF'S MOTION FOR *EX PARTE* |
| Defendants. | *EMERGENCY* TEMPORARY RESTRAINING ORDER AND OTHER EQUITABLE RELIEF |
| | |
| | [FILED UNDER SEAL] |

I, Svetlana S. Gans, hereby declare as follows:

1.      I am one of the attorneys representing the Federal Trade Commission ("FTC") in this action against:

      a.      Apply Knowledge, LLC (d/b/a Apply Knowledge Institute and Coaching Department), DAHM International, LLC, Dominion of Virgo Investments, Inc., eCommerce Support, LLC, Essent Media, LLC, eVertex Solutions, LLC, EVI, LLC (d/b/a Members Learning Center); Nemrow Consulting, LLC, Novus North LLC (d/b/a My Mentoring, Yes International, LLC, and Your eCommerce Support International), Purple Buffalo, LLC, Supplier Source, LLC, 365DailyFit, LLC, Vensure International, LLC, VI Education (collectively, the "Corporate Defendants"); and

      b.      David Gregory Bevan, Jessica Bjarnson, Phillip Edward Gannuscia, Chad Huntsman, Richard Nemrow, Jeffrey Nicol, Thomas J. Riskas, III, Ken Sonnenberg, and Babata Sonnenberg (collectively, the "Individual Defendants").

2.      I am a member in good standing of the bar of the District of Columbia (DC Bar No. 478651). My work address is Federal Trade Commission, Division of Marketing Practices, 600 Pennsylvania Avenue, NW, Mail Stop H-286, Washington, DC 20580. Unless indicated otherwise, I have personal knowledge of the facts stated herein and if called as a witness, would competently testify thereto.

3.      I submit this certification pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1746 in support of the FTC's *Ex Parte* Motion for a Temporary Restraining Order, Asset Freeze, Appointment of a Temporary Receiver, Immediate Access, Other Equitable Relief, and an Order to Show Cause Why a Preliminary Injunction Should Not Issue, and Memorandum in Support Thereof ("TRO

Motion"), and in support of the FTC's request that the Temporary Restraining Order ("TRO") be issued without notice to Defendants. I also submit this certification in support of the FTC's *Ex Parte* Motion for an Order Temporarily Sealing the File, and Memorandum in Support Thereof, filed contemporaneously with the TRO Motion.

4.      Pursuant to Rule 65(b)(1), this Court may issue a TRO without notice to Defendants if FTC counsel "certifies in writing any efforts made to give notice and the reasons why it should not be required." For the reasons discussed below, the FTC has *not* provided Defendants with notice of the filing of this action or the TRO Motion. The interests of justice require that these filings be heard *ex parte*.

### DEFENDANTS' DECEPTIVE MARKETING PRACTICES

5.      The evidence set forth in the TRO Motion and supporting exhibits, filed concurrently herewith, demonstrates that Defendants have engaged in a deceptive lead generation and telemarketing scheme that has caused economic injury to thousands of consumers throughout the United States and that violates Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a), and the Telemarketing Sales Rule, 16 C.F.R. Part 310.  The Defendants operate as a common enterprise to prey on consumers hoping to earn money via a home-based internet business.  Defendants operate through a multitude of corporate names and oft-changing d/b/as and rely on deceptive tactics to induce consumers to pay thousands of dollars – most of it borrowed on personal credit cards – for goods and services that are of little if any value in creating a home-based Internet business.  Consumers make these purchases based on Defendants' representations that they will end up with an online business generating substantial revenue.  Yet, most consumers who purchase Defendants' goods and services earn little or no money and end up heavily in debt.

6.     Different Defendants perform a variety of roles in the scheme, with each role integral to the overall success and profitability of the scheme.  Some Defendants focus on generating leads, i.e. locating and luring consumers who are interested in making money from home. Defendants lure them in by disseminating deceptive emails and websites designed to induce consumers to purchase a relatively inexpensive work-at-home program. Once consumers have been hooked by the initial low-priced offer, Defendants use deceptive telemarketing sales pitches to sell consumers a business coaching service costing thousands of dollars.

7.     Following this sale, Defendants purport to provide these "coaching" services —which are of little real value for consumers— and try to keep consumers believing and involved in the coaching process for at least a few weeks. This is done in order to (1) keep consumers from realizing that they were scammed and (2) make consumers believe that they're progressing toward an online business, thus enabling the Defendants to go back to them for more and more money by peddling additional goods and services that consumers are told they will need for their forthcoming online businesses.  The scheme generally continues until consumers either realize that they are not receiving what they were promised and are victims of a scam, or until they reach the limits on their credit cards.

8.     Defendants' deceptive sales pitches violate the FTC Act.  In addition, the Defendants' telemarketing campaigns violate the Telemarketing Sales Rule's restrictions against misrepresenting or failing to disclose material information about the services being offered.

## THE PROPOSED TEMPORARY RESTRAINING ORDER

9.     The proposed TRO would: (1) freeze the Defendants' assets to preserve them for potential restitution to victims; (2) appoint a temporary receiver over the

4

Corporate Defendants, to help preserve assets and manage the affairs of the Corporate Defendants; (3) grant the FTC immediate access to the Corporate Defendants' business premises and records, and an accounting of their assets; (4) allow for expedited discovery; (5) provide other equitable relief; and (6) require Defendants to show cause why this Court should not issue a preliminary injunction extending such temporary relief pending an adjudication on the merits.

**REASONS WHY *EX PARTE* FILING IS NECESSARY**

10.     There is ample evidence that Defendants have the motivation and opportunity to conceal and dissipate assets and destroy important documents, as demonstrated by, among others:

   a.     Defendants have regularly changed the name of their business coaching scam, as consumer complaints mounted, in an effort to avoid detection while they have tricked consumers into paying money for bogus products and services.

   b.     Defendants have created a maze of LLCs and dbas in order to disguise the true identities of individuals involved in the scam, thereby confusing consumers, making it difficult for consumers to obtain refunds, and thwarting law enforcement efforts to investigate their scam.

   c.     Defendants have used phony names and addresses on corporate filings, including a variety of mail drop boxes.

   d.     Defendants have opened hundreds of new merchant accounts in the names of shell businesses and used them to process consumer credit card payments, in order to obscure where victim money is actually going.

5

11.     All of this evidence taken together demonstrates a likelihood that if Defendants are given advance notice of the Commission's request for temporary relief, they will dissipate assets or destroy or conceal evidence of their unlawful conduct.

## RELEVANT PRECEDENT

12.     As illustrated by the following examples, provided on information and belief, it has been the FTC's experience that FTC defendants who are engaged in unfair and deceptive schemes, and who receive notice of a motion for a TRO prior to service on third parties, or the FTC's plans to file an action alleging consumer fraud, frequently attempt to undermine the FTC's efforts to preserve the status quo by dissipating, transferring, and concealing assets, and hiding and destroying documents:

13.     In *FTC v. Transcontinental Warranty, Inc.*, No. 09-2927 (N.D. Ill. 2009), the FTC moved for a temporary restraining order but provided prior notice to the defendants rather than going ex parte.  The Court granted the FTC's motion for a temporary restraining order freezing the defendants' assets and appointing a receiver, but when the receiver and FTC arrived at the defendant's premises, they found hundreds of empty file folders with labels indicating that they had contained records of recent transactions. The defendants also told the receiver that five computers, including that of the corporate defendant's CFO, had been "stolen" the night before, and thus could not be examined.

14.     In *FTC v. Connelly*, No. 06-cv-00701 (C.D. Cal. 2006), the court issued an asset freeze against defendant Connelly but not against his co-defendant partners. Unfortunately, the FTC had trouble locating Connelly and implementing the freeze, and by the time he was located, his partners had tipped him off and he and they had withdrawn almost a million dollars from various corporate and personal bank accounts. The defendants subsequently took a vacation to Hawaii.

15.     In *FTC v. Assail Inc.*, No. 03-007 (W.D. Tex. 2003), the President of a company controlled by the defendants  managed to transfer more than $360,000 from company accounts before the asset freeze could be fully secured.  The court held that the officer was in contempt and jailed him for three weeks, but had to let him go after he established that nearly all of the money was already gone.

16.     In *FTC v. Physicians Healthcare Development, Inc.*, No. 02-02936 (C.D. Cal. 2002), defendants were given short notice of a temporary restraining order hearing. By the time of the hearing, however, defendants had removed all business records and computer equipment from the business premises, none of which were ever recovered.

17.     In *FTC v. Thomas E. O'Day*, No. 94-1108-CIV-ORL-22 (M.D. Fla. 1994), the district court denied the FTC's request to issue an asset freeze without notice, and scheduled a noticed hearing on the relief sought.  Within hours of receiving notice, an individual defendant withdrew approximately $200,000 from one of his bank accounts.

18.     In *FTC v. Renaissance Fine Arts, Ltd.*, No. 1:94CV0157 (N.D. Ohio 1994), the FTC filed a case alleging the misrepresentation of works of art without seeking an ex parte temporary restraining order with asset freeze.  Shortly after the action began, the defendant liquidated his business and fled the country.  The FTC then sought a temporary restraining order with an asset freeze, but it was too late. Although the FTC ultimately obtained a substantial monetary judgment, it could not be collected.

19.     In *FTC v. Academic Guidance Services*, No. 92-3001 (AET) (D.N.J. 1992), defendants discovered that the FTC intended to file a case against them (and seek an ex parte temporary restraining order) the following week.  The FTC later learned that after this discovery, the defendants promptly leased a document shredder and spent the weekend destroying evidence.

20.     In *FTC v. Applied Telemedia Engineering and Management, Inc.*, No. 91-635 (S.D. Fla. 1991), the defendants were advised, pursuant to an agreement with the FTC, that the FTC had filed its complaint and intended to seek a temporary restraining order with an asset freeze from the court.  When the FTC's agents went to the defendants' offices to service process, they observed the defendants removing boxes of documents from the premises.

21.     The following examples, also provided on information and belief, have been identified within the FTC as incidents illustrating the Commission's experience that temporary restraining orders with asset freezes, including ex parte temporary restraining orders, are effective at helping prevent dissipation or concealment of assets, or aiding in their recovery:

22.     In *FTC v. Prime Legal Plans*, No. 12061872 (S.D. Fla. 2012), the FTC sought and received a temporary restraining order and asset freeze against the defendants. Despite this, defendants, after learning of the FTC's action but before the asset freeze had been fully implemented, immediately directed the transfer of approximately $1.7 million from corporate bank accounts and into accounts held by a relative, a spouse, and a girlfriend.  Because the court had issued an asset freeze, the bank was able to recover close to $1.5 million of that money, although $197,000 had been spent and was not recoverable

23.     In *FTC v. Khalilan*, No. 10-21788 (S.D. Fla. 2010), the FTC sought and received a temporary restraining order and asset freeze, but the banks failed to implement it, and defendant withdrew approximately $72,000 shortly after a receiver took control of the defendants' company. The defendant then filed a police report claiming that he had been robbed of the money.  Faced with a contempt action for violating the asset freeze, the defendant's attorney returned $30,000 of the missing money to the receiver, who was

8

also able to recover approximately $14,000 from the banks that had allowed the unlawful withdrawals.

24.    In *FTC v. American Entertainment Distributors, Inc.*, No.  04-22431 (S.D. Fla. 2004), the court entered an asset freeze that froze assets of ten corporate and individual defendants.  Within hours of receiving notice of the asset freeze, one of the individual defendants withdrew $39,500 from his bank.  Because the asset freezes had been in place, the FTC was able to compel the individual defendant to return the money.

25.    In *FTC v. Assail Inc*., No. 03-007 (W.D. Tex. 2003), one of the defendants caused $200,000 to be transferred within hours of being served with the temporary restraining order. After contempt proceedings and a lengthy appeal, the defendant repaid the money.

26.    In *FTC v. The Tungsten Group*, No. 01-773 (E.D. Va. 2001), the FTC obtained an ex parte temporary restraining order with an asset freeze in a case involving fraudulent advance-fee loans.  The asset freeze frustrated one defendant's later attempt to withdraw funds from a frozen account.  Another defendant was persuaded by counsel to return money he had wrongfully wired out of an account before his bank could implement the freeze.

27.    In *FTC v. Productive Marketing*, No. 00-06502-NM-BQR (C.D. Cal. 2000), the defendants' attempt to withdraw money from their bank was stopped by the temporary restraining order.

28.    In *FTC v. Inetintl Com, Inc.*, CV-98-2140-CAS-CW (C.D. Cal. 1998), a defendant who had been served with the temporary restraining order nevertheless tried to withdraw money from his bank account, but was unsuccessful because the temporary restraining order had been served on the bank.

29.     In *FTC v. Equifin International*, CV-97-4526 DT (C.D. Cal. filed and ex parte temporary restraining order granted on June 20, 1997), due to an ex parte temporary restraining order and freeze, a receiver was able to recover money that an individual defendant had been able to withdraw after the order had been served on the corporate defendants.

30.     In *FTC v. Intellicom*, CV-97-4572 TJH (Mex) (C.D. Cal. filed June 23, 1997), because an ex parte temporary restraining order had been served on banks holding defendants' accounts, one of the banks refused to honor a defendant's request to wire out approximately $100,000.

31.     In *FTC v. United Consumer Services*, No. 94-CV-3164-CAM (N.D. GA filed Nov. 30, 1994; temporary restraining order granted early December), a defendant who withdrew $100,000 from a corporate account in violation of a temporary restraining order later produced the money in response to the FTC's contempt action based on his violation.

32.     For all the above reasons, as contemplated by Fed. R. Civ. Pro. 65(b), there is good cause to believe that immediate and irreparable damage will result to consumers from the dissipation of assets, and from the concealment, transfer or destruction of Defendants' records, if Defendants receive advance notice of the FTC's Complaint and TRO Motion. Thus, it is in the interests of justice that this Court grant the FTC's *Ex Parte* Motion for an Order Temporarily Sealing the File.

33.     The FTC has not made a previous application for similar relief in this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Dated: February 10, 2014

Svetlana S. Gans (pro hac vice pending)
Federal Trade Commission
600 Pennsylvania Ave. NW
Mailstop: H286
Washington, D.C. 20580
Tel. (202) 326-3708
Fax (202) 326-3395
sgans@ftc.gov


Attorney for Plaintiff
Federal Trade Commission

11